243 P.2d 789]

[Sac. No. 6139. In Bank. May 7, 1952.]

R. L. EBERHARDT et al., Appellants, v. ARTHUR C. BASS et al., Respondents.

2

Rutherford, Jacobs, Cavalero & Dietrich, D. R. Jacobs and William H. Woodward for Appellants.

Price, MacDonald & Knox, Mazzera, Snyder & DeMartini and Wallace W. Knox for Respondents.

CARTER, J.—In 1943, Empire Tract Company, as owner and lessor, leased to R. C. MacLean, lessee, a tract of farm land for the purpose of growing asparagus for a 10-year term, commencing January, 1943, with an option for two years more; the rental was 25 per cent of the asparagus grown. In 1943, MacLean planted asparagus. In 1944, MacLean, with the consent of the lessor, assigned his lease to defendant, Arthur C. Bass, who assumed MacLean's obligations under the lease. In September, 1944, Bass, with the lessor's consent, gave a crop mortgage on the asparagus crop to Richmond-Chase Company, the latter having financed the planting of the asparagus. In 1945, plaintiffs acquired title to the land subject to the lease. In 1947, Bass needed refinancing, which was obtained from defendant, Stokely Foods, Inc., and the rights and duties involved were set forth in agreements between the defendants and plaintiffs.

Upon a breach of the lease in 1949 by Bass, plaintiffs gave notice to defendants, and the default not having been cured, plaintiffs commenced the instant action against defendants to quiet title to the land and crops and sought to have it declared that defendants no longer had any interest in the land or asparagus crop. Defendant Bass defaulted, but Stokely asserted in detail its rights under the agreements. The court decreed, as we construe it, that Stokely shall be the owner of the asparagus crops to be grown through the 1955 season, when grown, in accordance with the asparagus contracts (hereafter mentioned) which were declared to be in full force; that plaintiffs are the owners of the land; that Stokely has a lien (to secure $47,893.19 due from Bass) on 75 per cent of the crops to be grown through 1955; that until the

rights of Stokely under the subordination agreement (hereafter mentioned) and the asparagus contracts have terminated, any new lease or conveyance of the land shall be subject to such agreements, and a lien is imposed upon the land to that extent; that the liens are to exist until the indebtedness is paid or 1955, whichever arrives first.

Plaintiffs appeal, urging two main contentions: That the 1947 agreement properly interpreted, as a matter of law, does not alter the general rule that a termination by the lessor of the lease for default, ended the security interest of Stokely in the crops, and that if the agreement does alter the rule, it is unconscionable and unfair and should not have been enforced in equity.

The 1943 lease provided that the lessor shall receive as "rental" for the property 25 per cent of all asparagus crops produced thereon during the term of the lease and renewals, to be delivered on the premises, and lessor to bear 25 per cent of the cost of packing the annual crop; lessee is to establish the crop (which has a normal life of 10 to 12 years); time is of the essence, and lessor may, upon 10 days' notice, terminate the lease for a breach of any of its terms by lessee. The crop mortgage to Richmond-Chase in 1944, embraced 75 per cent of the "crops of asparagus growing and to be grown," from October, 1944, to June, 1955, and was to secure $40,000 and further sums advanced and was consented to by the lessor; as a part of the transaction, MacLean assigned the lease to Bass and was released from all liability under the lease and his indebtedness to Richmond-Chase. An advance was made to Bass under the mortgage and he borrowed money from a bank, secured by his farm equipment during 1944-46. Finding himself in financial difficulties in 1947, Bass, without any participation by plaintiffs, approached Stokely to have it refinance him; his indebtedness then amounted to about $72,-000. Stokely was receptive, and its counsel, Mr. Knox, advised plaintiff, Eberhardt, by letter that Stokely would acquire the Richmond-Chase crop mortgage and would advance Bass funds to pay the debt on the equipment; that in return it wanted to buy from Bass all the canning asparagus grown during the term of the lease; and that proper documents for its security and a new crop mortgage be made and a memorandum of the lease recorded. Enclosed were two proposed contracts, one for the purchase of canning white asparagus and the other green asparagus, called asparagus contracts, also a "Subordination Agreement." Eberhardt's counsel sug-

gested changes in the latter agreement: (1) To the effect that if Bass defaulted and Stokely entered the leased property, Stokely would assume Bass' obligations, and (2) the lessors' rental of 25 per cent of the crops be excepted from the agreement. The subordination agreement and canning asparagus purchase contracts were signed by plaintiffs. Thereafter Richmond-Chase assigned its mortgage to Stokely.

The subordination agreement recites that plaintiffs are the owners of the land and of the lessors' interest in rentals to become due under the lease which is in full force; and that Stokely, under the terms of the agreement, is willing to loan money to Bass to finance him in the asparagus project under the lease. It then provided that in consideration of the loan by Stokely to Bass, plaintiffs "[3] agree that all claims of the [plaintiffs] against said . . . Bass, except for rental as provided in said lease, and any and all of the [plaintiff's] interest in or to, or claims against, any of the asparagus crops, except for rental as provided in said lease, shall be subject and subordinate to the claims of Stokely Foods, Inc., against said [Bass] lessee and against said crops under any crop contract and any crop mortgage the lessee [Bass] . . . may execute and deliver to Stokely Foods, Inc., covering said asparagus and shall be subject and subordinate to the claims of Stokely Foods, Inc., as assignee of Richmond-Chase Company, . . . under that certain crop mortgage executed by . . . Bass, dated September 30, 1944, . . . .

"[4] Should the lessee [Bass] breach or abandon said lease or do or cause anything to be done whereby he might or would lose possession of said land, the [plaintiffs] hereby agree to permit Stokely . . . to exercise all rights which it has under any crop contract and/or any crop mortgage as if lessee had not breached said lease or had remained in possession, as the case may be, and agree that Stokely . . . will be permitted to take possession of said crops and dispose of them as provided in said crop contract and/or crop mortgage for a period not exceeding the term of said lease, provided while Stokely . . . is in possession of the demised premises it shall perform all of lessee's [Bass'] agreements as set forth in said lease.

"[5] If said real property should be relet, sublet, sold or encumbered before the rights of Stokely . . . under said contract or crop mortgage terminate, the [plaintiffs] further agree that any new lease to the same lessee or to any other person and any deed or other conveyance or mortgage or

deed of trust of said real property shall contain a provision expressly recognizing the agreements herein provided for and subordinating the right of the lessee or transferee to the rights of Stokely . . . under any crop contract, any crop mortgage, and hereunder.

"[6] In said lease it is provided that lessors shall be entitled to receive 25% of all of the crops of asparagus produced on said land during the term of said lease as rental and that lessor may elect to dispose of its said percentage through lessee. The [plaintiffs] hereby agree that they have this day sold their share of said crops of canning asparagus to Stokely . . . and that they will not elect to permit lessee to dispose of said canning asparagus.

"[7] The [plaintiffs] hereby consent to the assignment by lessee of said lease to Stokely . . . for the purpose of securing any indebtedness of said . . . Bass (including said Richmond-Chase crop mortgage) and the [plaintiffs] further consent to the sale and/or mortgage by said . . . Bass of his interest therein to Stokely . . . of the canning asparagus growing and to be grown upon the demised premises.

"[8] In the event lessee [Bass] defaults in any obligation contained in said lease, before exercising any rights contained in said lease, the undersigned agree to give Stokely . . . written notice thereof . . . and to give it ten days within which to cure said default before exercising any right of reentry, cancellation or termination of said lease, it being understood that so long as said lease is assigned to Stokely . . . the bankruptcy or insolvency of said . . . Bass shall not be a ground for termination of said lease."

In 1949, two years after the subordination agreement, Bass having failed to operate the property as required by the lease, plaintiffs gave notice to him and Stokely of its termination. The default not being cured, plaintiffs entered into possession of the property and commenced the instant action.

■ Commencing with the premise that the interest of a crop mortgagee under a mortgage on crops to be grown, given by the lessee as mortgagor on the latter's share of the crops, expires when the lease is terminated for the default of the lessee, plaintiffs urge that the subordination agreement does not negative the application of that rule; that therefore Stokely's interest was lost when the lease was terminated for Bass' default and their title should have been quieted against Stokely.

The subordination agreement, as above seen, specifically states that all claims of plaintiffs against Bass, which could include a right to terminate the lease, and *all plaintiffs' interest in or claim against any of the asparagus crops,* which may reasonably embrace the right to crops to be grown that plaintiffs would acquire by terminating the lease, are subject and subordinate, that is, inferior to Stokely's rights against Bass under any crop contract or mortgage, that is, the right to have the crops to be grown as security for the debt owed by Bass to Stokely. ■ In harmony with that construction, and implementing it, Stokely is given the right to exercise all of its rights under any crop mortgage, if Bass should breach the lease, the same as if the lease had not been breached, and may take possession of all crops and dispose of them for the term of the lease, provided it abides by the lease. While the expression that the rights under the contracts might be exercised for the term of the lease may be susceptible of the meaning that if the lease was terminated the rights would cease, it may also be susceptible of the meaning that such rights might be exercised for the period covered by the lease, 10 years plus two one-year renewals. To that end plaintiffs must give Stokely notice of any breach of the lease by Bass. This might indicate that Stokely's rights are restricted to Bass' but not necessarily so by reason of the other terms of the contracts. ■ Moreover, if conditions should change, such as a reletting, subletting, selling or an encumbering before Stokely's rights under the crop mortgage end, any such new arrangements should recognize the rights of Stokely. A reletting means a new lease which embraces a termination of the Bass lease, hence the inference is that the termination of the Bass lease is not to end Stokely's rights.

Plaintiffs urge, however, that the changes made at their request, in the subordination agreement, before its execution, shows a contrary intent. The first change was that made in paragraph four. As proposed, it read, after the last use of the word mortgage, ''during all of the years covered thereby,'' and the change in lieu of that provides as it does ''for a period etc.'' They claim that the former clause would cover the crops for the years to 1955 mentioned in the crop mortgage, but the change fixed the period for the term of the lease, which might be less if terminated by plaintiffs. If their theory is correct that ordinarily a crop mortgage dies with the lease, the originally proposed

words might not have the meaning they claim. ■ As above seen, the expression used, "term of said lease," may well mean the years expressed on its face as its life. ■ There was also added to the paragraph the provision that if Stokely did take possession it must perform the terms of the lease while in possession. This may reasonably indicate Stokely's duties if it chose to take possession as an alternative means of protecting its superior rights given by the forepart of the agreement and not as a restriction on those rights if it did not choose to take possession.

■ The second change, in paragraph seven, consisted of the addition of the words "by Arthur C. Bass, of his interest therein to Stokely" after the last use of the word mortgage. There may be some indication that only Bass' interest in the crops might be sold or mortgaged and thus when the lease was terminated there would be no interest to mortgage or sell, but it does not necessarily negative the forepart of the lease. It may be that plaintiffs intended by this amendment to prevent a holding out of themselves as guarantors of Bass to the full extent of the crops, including their 25 per cent as lessors, but it does not conclusively show that the crop to be grown was not to be subject to the indebtedness for as long as the 10-year term and renewal period of the lease.

■ Plaintiffs urge that the contracts (called asparagus contracts) under which the asparagus crops were to be sold to Stokely, terminated with the termination of the lease. As heretofore shown, the subordination agreement recited that while the lease provided that plaintiffs may elect to dispose of their 25 per cent share of the crops through Bass, plaintiffs agreed that they have "this day sold their share" to Stokely. The asparagus contracts were executed with the subordination agreement and signed by Bass, plaintiffs and Stokely. They state that Bass and plaintiffs have "sold" and Stokely "has bought for the season 1947 to 1955," inclusive, the asparagus "which is growing or which" Bass and plaintiffs agree to grow upon the property. Detailed provisions are made including a promise in paragraph seven that "during the life of" the contract, plaintiffs and Bass will cultivate and care for the "asparagus beds" in a prudent manner. The judgment declared the asparagus contracts to be in full force and effect and Stokely to become the owner of the crops to be grown. Plaintiffs urge that the court erred in deciding that Bass and plaintiffs sold the crop to Stokely because

Bass, as lessee, had title to it under the lease and plaintiffs were entitled to only 25 per cent thereof as rental (see *Silveira* v. *Ohm*, 33 Cal.2d 272 [201 P.2d 387]) and therefore it could not have been intended that Stokely was bound by paragraph seven of the asparagus contracts. The language in paragraph seven, however, is specific and clear as above seen. Indeed, it may well be inferred, if plaintiffs' argument is accepted, that it was intended that plaintiffs must abide by that paragraph at a time when Bass would no longer have title to the crop, that is, after the lease was terminated, thus indicating that the termination of the lease was not to destroy Stokely's rights.

Plaintiffs urge various other asserted ambiguities in the asparagus contracts when read with the other instruments, such as that plaintiffs could not have been the seller of the crop and pass title thereto when they did not have it, and the statement that there were no encumbrances on the crops when there were. These factors do not compel us to ignore the clear and positive provisions of the contracts which are reasonably susceptible of the interpretation placed thereon by the trial court.

The contracts died with the lease, argue plaintiffs, because the Knox letter written during the preliminary negotiations referred to the purchase of the crops to be grown during the term of the lease. As we have seen, however, that is not the necessary construction of the subordination agreement and the asparagus contracts are expressly made to run to 1955.

Plaintiffs claim the court erred in concluding that Stokely may retain 75 per cent of the amounts to be paid by it for asparagus under the asparagus contracts until it has been reimbursed for Bass' indebtedness to it in the sum of $47,893.19. This is the legal effect of the conclusion of law in the judgment that Stokely has a lien on the crops to secure that indebtedness, and it follows that it should receive the proceeds from the crops until it is paid.

Plaintiffs assert that the refinancing arrangement consisting of the crop mortgage, subordination agreement and asparagus contracts as interpreted by the trial court is unfair and unconscionable; and that a lien cannot be equitably imposed to enforce them beyond the term of the lease because plaintiffs get nothing out of it and the benefits all lie with Stokely. To that end they urge that Stokely gets: (1)

The right to the asparagus crops to be grown under the asparagus contracts; (2) Bass' promissory notes; (3) a crop mortgage on 75 per cent of the crops; (4) a discount on the Bass indebtedness of $14,000; (5) a chattel mortgage on Bass' farming equipment; (6) an assignment of Bass' lease; and (7) security rights under the subordination agreement. With regard to (1) the contracts assured to plaintiffs the current market price for the crops. As to Bass' notes, Stokely paid the original mortgagee, Richmond-Chase, and any benefit that would accrue by a reduction in the debt would be to make the debt less. The assignment of the lease was something that came from Bass, not plaintiffs. The essence of plaintiffs' argument seems to be that, as interpreted by the court, the refinancing arrangement imposed upon the asparagus crop and property, liens for an obligation incurred by MacLean and Bass, not plaintiffs, and for a period beyond the termination of the lease for Bass' default; that for having their property encumbered by that obligation they received nothing. They did receive value, however, when we look at the whole transaction. The original indebtedness was incurred to establish the perennial asparagus plants and bring them to a producing stage. That was a benefit to plaintiffs' land, rendering it productive of valuable crops of which they were to receive 25 per cent. In 1947, by the refinancing arrangement, the debt became less and the asparagus contracts were made to assure plaintiffs and Bass of a certain market. Certainly plaintiffs were benefited by having a properly financed lessee who would carry out the lease. When the refinancing arrangement was made it may be assumed that the parties believed the value of the crops would pay for their care and cultivation and still leave a profit. The termination of the lease would not necessary alter that situation, for it would only change the personnel of the one who cared for and harvested the crops. If defendants performed that function they would realize any profit Bass would have made. The fact remains that the crops were assumed to be a benefit to all concerned and they were made possible by the money advanced.

To plaintiffs' contention that the lien should not have been imposed, it is clear from the foregoing discussion that the property was to be security for the indebtedness under the refinancing instruments. The court did nothing more than declare their effect.

It is claimed that there is no allegation or finding that the refinancing arrangement was fair and plaintiffs received value. The transactions were fully set forth in Stokely's pleadings and the findings of the court and we do not see how plaintiffs were prejudiced by failure to set forth more.

Judgment affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., Schauer, J., and Spence, J., concurred.