In re GVF CANNERY, INC., dba Garden
Valley Foods, a California
corporation, Debtor.

Ed SILVA, dba Ed Silva Farms, Plaintiff,

v.

GVF CANNERY, INC., dba Garden
Valley Foods; and Wells Fargo
Bank, N.A., Defendants.

Bankruptcy No. 91–57000–ASW.
Adv. No. 92–5059.

United States Bankruptcy Court,
N.D. California.

Sept. 29, 1995.

William J. Bush (argued), Hanson, Bridgett, Marcus, Vlahos & Rudy, San Francisco, CA, for Plaintiff Ed Silva.

Paul R. Bessette (argued), Brobeck, Phleger & Harrison, San Francisco, CA, for Defendant Wells Fargo Bank, N.A.

Defendant GVF Cannery, Inc., the Debtor in the Chapter 7 case herein did not appear at trial.

## MEMORANDUM DECISION

ARTHUR S. WEISSBRODT, Bankruptcy Judge.

Trial in this matter was held before the undersigned on October 3, 4, 5, and 6, 1994, and November 9, 1994. William J. Bush, Esq. of Hanson, Bridgett, Marcus, Vlahos & Rudy appeared for Plaintiff Ed Silva ("Silva"). Paul R. Bessette, Esq. of Brobeck, Phleger & Harrison appeared for Defendant Wells Fargo Bank ("Bank"). Defendant GVF Cannery, Inc. ("GVF"), the Debtor in the Chapter 7 case herein, did not appear at trial.[1]

Silva called as witnesses: Edward Silva, Jr., the Plaintiff; James A. Peasley, former President of GVF; and John R. Skelton, a Certified Public Accountant, who was qualified as an expert witness to interpret the books and records of GVF.

Bank called as witnesses: Roland Tucker, a Vice President of Bank; and David A. Morisoli, Silva's brother-in-law and employee. Bank offered Frederick D. Holden, Jr., an attorney, as an expert witness regarding standard commercial practice in the use of subordination agreements in real property and personal property secured transactions, but did not establish a sufficient foundation and the Court did not qualify the witness as an expert; Mr. Holden did not testify.

Fred Avalli (an officer, director, and shareholder of GVF) did not testify, but a transcript of his deposition taken on April 6, 1992 was admitted into evidence as Defendant's Exhibit BE.

The following represents the Court's findings of fact and conclusions of law, pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

### BACKGROUND

GVF operated a cannery, processing produce that it bought from growers. GVF obtained its financing from Bank in several forms, all of which were cross-collateralized, such that Bank held security interests in virtually all of GVF's assets.

Silva contracted to sell tomatoes to GVF during the 1989 season; in connection with that contract, Silva signed a document that provided for subordination of his producer's lien upon GVF's inventory to any security interest held by Bank upon the same assets. Silva was paid in full for his 1989 crop. Silva then contracted to sell more tomatoes to GVF during the 1990 season, and signed two other documents purporting to provide for subordination of his producer's lien to the security interest of Bank. Silva was not paid in full for sale of his 1990 crop to GVF; when GVF filed its Chapter 11 petition in November 1990, the unpaid balance owed to Silva was $1,107,001.45.

Pursuant to orders of this Court and a stipulation with Silva (see footnote 1 above), Bank has liquidated its collateral, including

---

1. GVF filed a voluntary Chapter 11 petition in bankruptcy on November 12, 1991 and the case was converted to one under Chapter 7 on May 15, 1992. By orders of this Court, Bank received relief from the automatic stay of 11 U.S.C. § 362(a) to foreclose upon GVF's inventory and other assets subject to a security interest of Bank, and GVF's Chapter 7 Trustee abandoned the inventory. Pursuant to a stipulation between Silva and Bank, approved by an order of this Court, Bank was permitted to sell the inventory and use the proceeds to reduce GVF's debt to Bank, with the proviso that, if Silva ultimately prevailed in this litigation, Bank would reimburse him in full. Accordingly, although GVF remains a party to this action, it is not directly affected by these proceedings.

such inventory as was subject to Silva's lien. The proceeds were insufficient to cover fully the amount secured by Bank's security interest so that, if Silva's lien is subordinated, Silva will receive nothing. Silva's complaint seeks a determination that his lien is not subordinated to Bank's security interest.

## II.

### THE CALIFORNIA PRODUCER'S LIEN

 California law provides for a producer's lien upon farm products sold by a grower or producer such as Silva to a processor such as GVF, pursuant to the California Food and Agricultural Code ("Food & Ag.Code"), Article 9, §§ 55631–53. The lien arises, and attaches automatically, when the products are delivered to the processor, to the extent of the agreed price to be paid for the product by the processor to the grower (or, if no price has been agreed upon, to the extent of the value of the product at the time of delivery). The lien extends to all of the product's subsequent processed or manufactured forms. The lien is prior in preference (to the extent of the value of the specific product delivered) to all other liens and encumbrances with the exception of specific claims for unpaid wages or salaries, or a warehouseman's lien under Division 7 of the Uniform Commercial Code. "The producer's lien is central to an extensive California statutory scheme giving farm producers a lien on all farm products they sell.... The sense underlying the statutory scheme is that other creditors should not be allowed to benefit from the pockets of laborers and suppliers who have increased the estate's value, or, indeed, have created it." *In re Loretto Winery*, 898 F.2d 715, 720–21 (9th Cir.1990) ("*Loretto Winery*"). The California producer's lien is recognized and upheld in bankruptcy cases, *Loretto Winery, In re T.H. Richards Processing Co.*, 910 F.2d 639 (9th Cir.1990) ("*T.H. Richards*"). It is undisputed that Silva acquired a California producer's lien upon the tomatoes that he delivered to GVF in 1990.

## III.

### RELEASE OF A PRODUCER'S LIEN

 The California producer's lien continues in effect until such time as it is re-leased. The Food & Ag.Code provides for release under two sections of Article 9: § 55639, which enables the processor to secure a release; and § 55637, which pertains to voluntary release by the grower.

Under § 55639, a processor may obtain release of a producer's lien in one of five specified ways:

(a) By paying the agreed or actual value of any farm product which is purchased within 20 days from the date of delivery of the farm product unless the date of payment is otherwise agreed upon in writing or such payment is secured other than by lien.

(b) By depositing with the director a surety bond which is executed by such processor as principal and by a surety company which is qualified and authorized to do business in this state as surety in an amount which equals the current market value of the product or processed product which is intended by the processor to be sold or otherwise disposed of, as such value may appear by the sworn statement of such processor in accordance with quotations from the federal-state market news service or other evidence which is satisfactory to the director. The bond shall be conditioned that if the processor fails to pay up to the amount of such bond the lawful claims of all producers whose liens have been released by the bond, within 35 days after date of the bond, the surety shall be liable to and shall pay to the state on behalf of such claimants all such lawful claims as may be covered by the amount of the bond, together with costs of suit if an action is filed on the bond.

(c) By depositing with the director a cash sum in lawful money of the United States which is expressly set apart by an instrument in writing that is signed by the processor for the purpose of guaranteeing to the extent of such sum, payment of all existing claims of producers whose liens are released by the deposit, within 35 days from the date of the deposit. The director shall be named in such instrument as trustee to carry out the purpose and intent of the instrument.

(d) By designating, setting apart, and depositing in a public warehouse a quantity of any processed farm products and endorsing over to the director and delivering to him the warehouse receipt for such products for the purpose of guaranteeing to the extent of the value of such deposit, payment within 35 days from the date of such deposit, all existing claims of producers and labor claimants whose liens are released by it.

(e) By securing a release from the director after payment in full for such farm product.

These five procedures are the only means by which a processor can effect a release of a producer's lien by operation of law, *T.H. Richards*. Bank does not contend that any of these methods was employed here, so it follows that Silva's lien was not released pursuant to § 55639.

■ Under § 55637, the grower may voluntarily release the lien upon the occurrence of certain events:

Any lien on any product or processed product may, however, be released, to the extent the value of the claim upon such product is secured, by a surety bond or a cash deposit or other security given as provided in this article. Any producer may also release any lien which is possessed by him upon payment being made to him for the agreed or reasonable value of the product which is so sold and delivered, or upon arrangements being made for such payment which are satisfactory to the producer.

The first sentence of this section reiterates that a lien may be released upon the provision of alternate security in accordance with § 55639, which event did not take place in this case. The second sentence of this section provides for release of a lien by a grower who has either been paid, or with whom satisfactory arrangements for payment have been made. It is undisputed that Silva was not paid in full, so the first clause of the sentence does not apply here. As to the

second clause of the sentence, Bank at one time contended (in a footnote in a supplemental brief prior to trial) that Silva's lien could be viewed as having been released through satisfactory payment arrangements having been made, by virtue of Silva entering into the 1990 contract and subordination agreement with GVF. However, the Ninth Circuit has held that release under § 55637 is permissive on the part of a grower, not mandatory, and that this section does not provide that, by merely agreeing to a deferred-payment plan, a grower releases its producer's lien as a matter of law, *T.H. Richards*. The same rationale applies with equal force to a grower entering into a contract that calls for payment to be made in future, accompanied by a lien subordination.[2] Therefore, Silva's lien was not released pursuant to § 55637.

## IV.

### *SUBORDINATION OF A PRODUCER'S LIEN*

Silva's lien, not having been released, continued to attach to the product that he sold to GVF in 1990. Since, under Food & Ag. Code § 55633, a producer's lien is senior in priority to all other liens and encumbrances (with certain exceptions not relevant here) upon the same product, Silva's lien would ordinarily be superior to the general security interest held by Bank upon that inventory. However, Silva signed a document that Bank contends operated to subordinate Silva's lien to the security interest of Bank.

#### *A. Subordination vs. Release*

■ Silva first argues that subordinating a producer's lien is the equivalent of releasing the lien, such that subordination cannot occur as a matter of law unless the release procedures of Food & Ag.Code Article 9 are followed. Since the parties did not comply with either § 55639 or § 55637, no release was effected; if a subordination is tantamount to a release, as Silva urges, then failure to comply with these statutory release require-

---

**2.** There is even less reason to think that the legislature intended for execution of a subordination agreement to constitute "arrangements being made for ... payment which are satisfactory to the producer" than there is to think that the legislature intended for subordination of a lien's priority to be equivalent to an actual release of the lien itself, as discussed *infra*.

ments operates equally to preclude subordination.

It is true that, in a situation such as that here, where all assets of GVF were insufficient to satisfy the debt of Bank, subordination of a producer's lien to the security interest of an undersecured lender does, as a practical matter, have the same effect as releasing the producer's lien altogether. Silva argues that, in giving up his senior position in terms of lien priority, he "released" his lien within the meaning of the statute. Under this analysis, the producer's lien and its senior priority position would have to be viewed as a single bundle of rights (a first-priority-lien), rather than as two separate rights (one, a lien; and, two, a first priority position for the lien). This approach has a certain amount of appeal, both the lien itself and its senior priority position being creatures of the same statute (albeit created by different sections of the Food & Ag.Code: § 55631, "Existence and extent of lien", creates the lien itself and § 55633, "Preference", establishes its priority). However, there appears to be no support for such a view, nor for Silva's theory that subordination of a lien's priority constitutes a release of the lien within the meaning of Food & Ag.Code § 55639 and § 55637. The Food & Ag.Code itself does not expressly refer to subordination at all, much less include it as a form of release governed by § 55639 and § 55637. Numerous other California statutes do provide for subordination *per se* and distinguish between release and subordination.[3] Substantively, the act of release and the act of subordination perform different functions and have different results: release discharges a lien and removes it from the collateral, leaving the collateral unencumbered by the released lien; subordination merely reorders the priority of liens upon collateral without removing the subordinated lien, which continues to encumber the collateral. *E.g.:* CCP § 697.650(a) and § 697.510; CCP

§ 697.370 and § 697.310, § 697.320; *United States v. Wilson,* 806 F.2d 171 (8th Cir.1986). Since a subordinated lien continues to exist, it has the potential of rising in priority as senior encumbrances are discharged, and the lienholder remains a secured (albeit perhaps an undersecured) creditor; a released lien ceases to attach to collateral at all, and the holder of a lien that has been released is a purely unsecured creditor with respect to any debt that was not paid prior to release. California statutes that expressly provide for both release and subordination recognize that the two terms have different meanings and constitute different undertakings with different consequences. Against this background, it cannot fairly be assumed that the legislature would ignore the careful distinction between the concepts of "subordination" and "release" that is observed in numerous other statutes, and use the term "release" as some sort of shorthand to stand for both terms in the Food & Ag.Code. The better analysis is that the legislature is well aware of the difference between relinquishing a lien altogether and merely altering its priority, and would have expressly referred to subordination as such in § 55639 and/or § 55637 had it wished to circumscribe subordinations as well as releases.[4]

### B. Public Policy

Silva next argues that subordination of a producer's lien is not permitted by the Food & Ag.Code, and would violate public policy.

The Food & Ag.Code neither expressly provides for, nor prohibits, subordination of producers' liens. The lack of a statutory basis is not dispositive since, as a general proposition, any agreement to subordinate is nothing more than a contract, dependent upon no special statutory authority for its existence, and enforceable according to general principles of contract law, *Bank of*

---

3. Including, but not limited to: Code of Civil Procedure ("CCP") § 697.650, § 697.370, § 697.400, § 2103(a), § 2103(b)(1), (2); Government Code § 27248, § 27282, § 27330, § 66499, § 7174, § 7223, § 7225, § 7227; Health & Safety Code § 2285.5, § 2586.3(b); Public Resources Code § 4179.5.

4. This Court notes that the failure of the Food & Ag.Code to address subordination (which appears to be a widespread practice) results in a lack of protection for producers, whose interests are the very ones that the lien provisions are designed to protect.

*America N.T. & S.A. v. Erickson,* 117 F.2d 796 (9th Cir.1941); *Eberhardt v. Bass,* 39 Cal.2d 1, 243 P.2d 789 (1952); *Bank of America N.T. & S.A. v. Engleman,* 101 Cal.App.2d 390, 225 P.2d 597 (1950).

Had the legislature wished to shelter producers' liens from the general enforceability of subordination agreements, it would have been a simple matter to draft a prohibition against them into the Food & Ag.Code, which has never been done. In fact, the legislature has declined to take a similar step concerning waiver of producers' liens. Assembly Bill 570 ("AB 570"), introduced in February 1983, would have amended the Food & Ag.Code to delete the portion of § 55637 that refers to "satisfactory arrangements", and to declare that any waiver of a producer's lien was void as contrary to public policy. Assembly Bill 570, 1983–84 Regular Session at 1. This legislation was never adopted by the Assembly. *See,* California Legislature, *Assembly Final History,* 1983–84 Regular Session at 424.[5]

Even before the introduction of AB 570, the Food & Ag.Code was amended in 1979 specifically with respect to the priority of producers' liens. Prior to that time, banks and other lenders were able to obtain priority over the producer's lien by filing a "Statement of Intention to Finance" with the Director of Agriculture, which would allow a processor to pledge the farm products that had been delivered to it, to obtain financing. *See,* Cal.Stats.1967, ch. 15, at 635, 671; former Food & Ag.Code §§ 55631, 55681–92. In addition, a producer's lien automatically expired sixty days after it went into effect, unless the producer filed suit within that time to enforce it. Former Food & Ag.Code § 55635. Growers were thus exposed to processors' unilateral subordination of producers' liens to general liens or other forms of security in favor of large financial institutions, despite the fact that banks were usually in a better position than farmers to take any accompanying risks. *See,* Cal.Senate Comm. on Judiciary: *Analysis of A.B. 774, 1979–80 Sess.* at 1 (as amended Aug. 20, 1979). To remedy this situation, the legislature amended the Food & Ag.Code in 1979 to eliminate these two provisions. *Id. See also,* Note, *The California Agricultural Producer's Lien, Processing Company Insolvencies, and Federal Bankruptcy Law: An Evaluation and Alternative Methods of Protecting Farmers,* 36 Hastings L.J. 609 (1985). It is noteworthy that, even though the 1979 amendments were aimed at protecting the priority of producers' liens, they did not include a prohibition of, or any restriction upon, voluntary subordination.

Silva compares the statutory lien protections afforded to farmers with those protecting mechanics' liens, which latter liens may not be voluntarily waived or subordinated except by specified forms and procedures. *See,* California Civil Code ("CC") § 3262; *Halbert's Lumber v. Lucky Stores, Inc.,* 6 Cal.App.4th 1233, 8 Cal.Rptr.2d 298 (1992) *("Halbert's Lumber"); Bentz Plumbing & Heating v. Favaloro,* 128 Cal.App.3d 145, 180 Cal.Rptr. 223 (1982) *("Bentz").* The policy roots of the producer's lien and the mechanic's lien are not dissimilar. *See, Industrial Asphalt, Inc. v. Garrett Corp.,* 180 Cal. App.3d 1001, 226 Cal.Rptr. 17 (1986). However, the California legislature has taken specific steps concerning mechanics' liens that it has not taken with respect to producers' liens. After the *Bentz* decision, in which the appellate court prohibited all waivers of mechanics' liens, havoc was wreaked on the construction industry in California, *Halbert's Lumber.* In response, the legislature amended CC § 3262 to permit voluntary

---

**5.** This Court notes the fate of AB 570 only for what it may be worth, which might be very little. The value of legislative history in the form of bills that have not been enacted has been disputed by the California courts. *Compare City of Victorville v. County of San Bernardino,* 233 Cal.App.3d 1312, 1321, 285 Cal.Rptr. 206 (1991) ("Unpassed bills, as evidences of legislative intent, have little value.") (quoting *Dyna–Med, Inc. v. Fair Employment & Housing Commission,* 43 Cal.3d 1379, 1396, 743 P.2d 1323, 241 Cal.Rptr. 67 (1987)) *with City of Santa Cruz v. Municipal Court,* 49 Cal.3d 74, 88–89, 776 P.2d 222, 260 Cal.Rptr. 520 (1989) ("We need not speculate, however, as to the Legislature's intentions in this regard. The legislative history ... reveals that the Legislature expressly considered and rejected...."). *See also Clark v. W.C.A.B.,* 230 Cal.App.3d 684, 281 Cal.Rptr. 485 (1991); *Farnow v. Superior Court,* 226 Cal.App.3d 481, 487 fn. 4, 276 Cal. Rptr. 275 (1990).

waiver of mechanics' liens, but only if made in writing in conformance with one of four forms set out in the statute. *Id.* No such restrictions appear in the Food & Ag.Code.

The provisions of the Food & Ag.Code should be liberally construed so as to achieve proper remedies and accomplish the Code's purpose, which is "promoting and protecting the agricultural industry" and "protect[ing] the public health, safety, and welfare." Food & Ag.Code § 3. *See also, McKee v. Bell–Carter Olive Co.,* 186 Cal. App.3d 1230, 231 Cal.Rptr. 304 (1986) ("*McKee*"); *Loretto Winery.* The existing case law unanimously favors the position of farmers when it comes to their rights in this area, *see generally, T.H. Richards, Loretto Winery, McKee.* Judicial constructions that restrict the effect of the producer's lien are disfavored, *T.H. Richards.* Even bearing these strictures in mind, however, Silva's argument that public policy bars the voluntary and specific subordination of a producer's lien is not supported. The 1979 amendments to the Food & Ag.Code were designed to prevent involuntary forfeiture of growers' rights, not those voluntarily signed away; *see,* Cal.Senate Comm. on Judiciary: *Analysis of AB 774, supra.* Six years later, AB 570, seeking to abolish all waivers of the producer's lien, was not enacted (and did not reflect the then-current state of the law).[6] This accumulated legislative history, together with a lack of authority to the contrary, leads to the conclusion that growers have a right to subordinate their producers' liens, voluntarily and specifically, without violating the public policy underlying the Food & Ag.Code.

## V.

### WAIVER

Silva urges that his agreement to subordinate his producer's lien to the security interest of Bank was a waiver, which was ineffective. Bank contends that the subordination agreement was not a waiver but, if it had been, it would be an effective one.

Neither the parties nor this Court has found any authority concerning the issue of whether subordination of a producer's lien constitutes a waiver. In *T.H. Richards* (a case involving release of a producer's lien, rather than subordination), the Ninth Circuit declined to consider whether waiver analysis is applicable to releases or, if so, what would constitute an effective waiver, those issues not having been raised below, *T.H. Richards,* at 647.

### A. Subordination of Priority Constitutes Waiver

"Waiver" is defined as "the intentional or voluntary relinquishment of a known right...." *Black's Law Dictionary* at 1417 (5th ed. 1979); *see generally,* 30 *Cal.Jur.,* Estoppel and Waiver § 1 (3d ed. 1987) and cases cited therein. In this Court's view, Silva's subordination of his producer's lien served to relinquish his priority status under Food & Ag.Code § 55633. Such an act clearly constitutes a waiver as defined. The issue is whether Silva's waiver should be given effect.

### B. Law of Waiver

Waiver of a right conferred by statute must be voluntary, knowing, and done with adequate awareness of the relevant circumstances and likely consequences. *Bauman v. Islay Investments,* 30 Cal.App.3d 752, 106 Cal.Rptr. 889 (1973) ("*Bauman*"); *Hittle v. Santa Barbara County Employees,* 39 Cal.3d 374, 216 Cal.Rptr. 733, 703 P.2d 73 (1985) ("*Hittle*"). There must be either an actual intention to relinquish the right, *Rheem Manufacturing Co. v. United States,* 57 Cal.2d 621, 371 P.2d 578, 21 Cal.Rptr. 802

---

6. "AB 570 proposes to add a new § 55654 which would make a waiver by a grower of his producer's lien void as a matter of public policy. Regardless of whether the legislature believes that as a policy matter waivers ought not to be permitted, § 55654 should make it clear that this statement is not declaratory of existing law. Since the producer's lien was passed and amended in 1979, many financing institutions and growers have on occasion required waivers from growers in order to permit financing of processor inventory. It would be unfair to now declare those waivers invalid after money was advanced in good faith reliance upon them." Uniform Commercial Code Committee of the Business Law Section of the State Bar Association, *Report on AB 570,* at 13–14, March 17, 1983.

(1962) ("*Rheem Manufacturing* "), or conduct so inconsistent with any intent to enforce the right as to induce a reasonable belief that it has been relinquished. *Crest Catering Co. v. Superior Court of Los Angeles County*, 62 Cal.2d 274, 398 P.2d 150, 42 Cal.Rptr. 110 (1965); *Rheem Manufacturing.*

 Whether there has been a waiver is a question of fact. *Howell v. Courtesy Chevrolet, Inc.*, 16 Cal.App.3d 391, 94 Cal. Rptr. 33 (1971); *Budaef v. Huber*, 194 Cal. App.2d 12, 14 Cal.Rptr. 729 (1961). If only one inference can be drawn from the evidence, the existence of waiver then becomes a question of law. *Loughan v. Harger–Haldeman*, 184 Cal.App.2d 495, 7 Cal.Rptr. 581 (1960); *see generally*, 30 *Cal.Jur.*, Estoppel and Waiver § 29 (3d ed. 1987). The burden is on the party claiming a waiver to prove it by clear and convincing evidence, such that the matter is not left to speculation. *Selna v. Selna*, 125 Cal. 357, 58 P. 16 (1899); *Harper v. Kaiser Cement Corp.*, 144 Cal.App.3d 616, 192 Cal.Rptr. 720 (1983); 30 *Cal.Jur.*, Estoppel and Waiver § 28 (3d ed. 1987). Doubtful cases will be decided against the existence of a waiver, especially when the right allegedly waived is one that is favored by the law. *City of Ukiah v. Fones*, 64 Cal.2d 104, 107, 48 Cal.Rptr. 865, 410 P.2d 369 (1966).

 Waiver of a right presupposes that the waiving party fully understands just what it is that is being relinquished. *Jones v. Brown*, 13 Cal.App.3d 513, 89 Cal.Rptr. 651 (1970); *People v. Connor*, 270 Cal.App.2d 630, 75 Cal.Rptr. 905 (1969). Silva claims that he signed the subordination agreement without the knowledge necessary to form such understanding, and after having been misled by GVF personnel.

### C. Facts

Silva has been a farmer in Monterey County since 1964. He began high school in Salinas and left school after completing the ninth grade. He is illiterate, although he can sign his name and can read numbers. His farming business has been successful and had sales of some $25,000,000 in 1989. At that time, he employed an office staff of three, including his sister Yvonne, her hus-

band David Morisoli ("Morisoli"), and Morisoli's sister Diane Johnson, all of whom are able to read; Morisoli is a graduate of California Polytechnic University, where he took a bachelor of science degree in 1975. Silva also used the services of an accountant and an attorney for his business.

Silva never did business with GVF until 1989. Prior to that time, his customers consisted primarily of supermarkets (60%) and freezers (40%). Sales to supermarkets were generally conducted on the basis of a handshake, but sales to freezers typically involved written contracts. Silva's policy in dealing with the written contracts for sales to freezers was to ask the buyer's representative (the field man) to explain the terms of the contract to him. Silva then reviewed the contract himself to see that the numbers in it—which he was able to read—were as represented, calculated those numbers, and decided whether he wanted to enter into the proposed transaction. In the early years of his business, Silva had asked his sister Yvonne or brother-in-law Morisoli to read contracts and explain them to him, but he soon ceased doing that as a matter of course. The various freezers' contracts were all similar in form and familiar to him; he felt comfortable relying on the field men's representations, and he was able to confirm the numbers for himself. The only time that Silva had encountered a subordination agreement prior to doing business with GVF was in approximately 1985, when he dealt with Watsonville Canning (which, despite the name, was a freezer). That processor failed to pay Silva and other producers, Silva had to hire an attorney and, after some two years, Silva and the other producers recovered such product as was in cold storage, representing only 25% of what they were owed. Aside from that experience, and now this one, Silva has never been involved in litigation over a transaction with a processor.

In late December 1988 or early January 1989, Silva received a telephone call from Fred Avalli ("Avalli"). Silva and Avalli had been "the best of buddies" in junior high and high school, and had kept in touch and on friendly terms ever since. At Avalli's request, Silva met with him and Tim Brooks

("Brooks"), a GVF employee, in January 1989. Silva testified that Avalli told him that he was an owner of GVF and either President or Chairman of the Board, "something that's way high up",[7] and that GVF was "doing pretty good". Avalli and Brooks wanted to know if Silva would grow 7,000 tons of tomatoes for GVF in the 1989 season. Avalli and Brooks knew that Silva could not read. They presented a written contract for the 1989 season and Brooks explained to Silva that it provided for Silva to furnish 7,000 tons of tomatoes to GVF at $53 per ton, to be paid within ten days after delivery. Silva signed the contract and Brooks then presented Silva with a written subordination agreement, telling Silva that the document meant that, if Silva signed it, Bank would give GVF money with which to pay Silva for his tomatoes. Silva signed the subordination agreement. Silva did not ask any questions about the documents or about GVF's financial condition. Silva delivered the 7,000 tons of tomatoes and was paid in full.

In September or early October 1989, Avalli and Brooks went to Silva's ranch in King City and approached him while he was out in the field supervising the tomato harvest. They told Silva that GVF wanted him to grow 30,000 tons of tomatoes in 1990. Silva testified that Avalli said that GVF was "making profits, doing good", and planned to double its tomato output in 1990. Avalli then called in November 1989 and asked Silva to have breakfast with him. Silva met Avalli and Brooks at El Charro, a restaurant, at which meeting, according to Silva's testimony, Avalli and Brooks told Silva that GVF's "pack plan" for the 1990 season had been approved by the bank, "everything was OK with the bank and they were ready to go forward". On December 11, 1989, Brooks came to King City and met Silva in the field. Brooks gave Silva a written contract with GVF for the 1990 season, calling for 30,000 tons of tomatoes at $54 per ton, to be paid within ten days of delivery. Brooks told Silva what the contract provided as to tonnage and delivery dates and Silva reviewed it to confirm those numbers and the price. Silva signed the contract. Brooks then asked

Silva to sign a subordination agreement that Brooks had with him; Silva testified that Brooks "said this is a clause that gives us the money to pay you, the only way we could pay from the bank is sign this and then the bank pays us and we pay you." Silva testified that he then asked Brooks "well, how about the bank, and he said that the bank is all squared away, their pack plan's in, everything is OK. Square. He said everything's square or it's ready to go, all ready to go." Silva asked no additional questions, and signed the subordination agreement.

Silva had no further contact with Avalli or Brooks until April 24, 1990 when, according to Silva's testimony, they asked Silva to meet them for breakfast again at El Charro. Avalli testified in his deposition that he believed he was in Mexico from February 1990 until May 1, 1990 but was not absolutely certain; he could not recall having this particular meeting with Silva. Silva testified that the meeting did take place on April 24, 1990 at El Charro, at which time Avalli produced another subordination agreement. Silva's testimony is that "when he handed it to me, I immediately says 'Freddy, you know, this is the second one. I—really a subordination is no good'", and Silva told Avalli about the bad experience held had with Watsonville Canning, which transaction had included a subordination agreement. Silva testified that Avalli's reply was "this subordination clause would do me no wrong. . . . He said that it guarantees you—you're going to get your money. The bank has guaranteed the money is going to be there for the tomato crop. . . . And, then they'll pay me in ten days and he said 'You only have to trust me for ten days and you'll have your money; can you trust me for ten days?'". Silva told Avalli that he would trust him, and signed the subordination agreement. Avalli's deposition testimony states that Avalli does not recall having made these statements, but that it is possible that he made them.

Silva testified that he was not told during the April 24, 1990 meeting why it was necessary for him to sign another subordination agreement when he had already signed one on December 11, 1989. Other testimony re-

---

**7.** Avalli's deposition testimony confirms that he was a sharcholder, director, and officer of GVF.

vealed that the December agreement contained two "typographical errors" (one in the date at the top of the agreement, and one consisting of an omitted sentence), and that the April agreement was a corrected version that Bank required to replace the incorrect December agreement. Both agreements were typed by GVF personnel from drafts prepared and furnished by Bank. The April 24, 1990 agreement (Exhibit 5) is one page long and recites in full (with original enhancements):

## SUBORDINATION AGREEMENT—1990

1. *Subordination Agreement.* In consideration of the extension of credit by Wells Fargo Bank ("WFB") (or any successive financial institution) to Buyer, the Seller hereby subordinates any and all liens which Seller may now or hereafter have on Buyer's inventory of farm products, processed and manufactured forms of such farm products, and the proceeds thereof, to the security interest granted by Buyer to WFB in all of Buyer's inventory and accounts receivable, whether now owned or hereafter acquired. This subordination does not prohibit payments by Buyer in accordance with the payment terms contained in any contract for the purchase of farm products between Buyer and Seller. However, if such payments are not made by Buyer, Seller shall have no right to enforce any lien subordinated pursuant to this Agreement until all obligations of Buyer to WFB, whether now existing or hereafter incurred, have been paid in full.

This subordination applies to any statutory lien in favor of Seller which arises under Section 55631 of the Food and Agricultural Code, along with all other liens, and is made with a full understanding of the fact that, pursuant to Section 55631, the purchase price of farm products sold to Buyer by Seller may be secured by a statutory lien in favor of Seller on such farm products and all manufactured and processed forms of such farm products in possession of Buyer and that, but for this subordination agreement, such statutory lien would have priority over the security interest of WFB.

Seller acknowledges that WFB will be relying on the effectiveness of this subordination in making loans to Buyer, to enable Buyer to have a need to purchase tomatoes from Seller, and that the tomatoes sold by Seller to Buyer, before and after they are processed and canned, may be included in the calculation of what Buyer may borrow from WFB. Therefore, Seller hereby agrees to indemnify WFB from any loss, liability or expense, including fees and expenses of attorneys, which WFB may incur if this subordination should, for any reason, not be fully effective and enforceable. Seller shall have no right to compel WFB to marshal its collateral security.

In spite of the representations that Silva says were made by Avalli, GVF was not actually "doing good" in December 1989 (when Silva signed the first subordination agreement for the 1990 season) or April 1990 (when he signed the corrected subordination agreement for the 1990 season). Roland Tucker ("Tucker") (a Vice President of Bank and the Bank officer who handled the GVF account) and James Peasley ("Peasley") (who became a consultant to GVF in 1984, then Vice President of GVF in 1987, and finally President of GVF from 1988 to June 1991) both testified that GVF had been experiencing financial difficulties for years. Peasley testified that, by 1986, GVF had become what he referred to as a "turn around" company, one with serious financial problems and in need of redirection. Net operating losses for 1985 and 1986 totalled over $6,000,000. Tucker testified that, in February 1987, Bank transferred GVF from its regular "commercial group" for borrowers in general to its "loan adjustment group" for borrowers whose financial condition had deteriorated or was deteriorating. In April or May 1987, Bank advised GVF to search for alternative financing; Tucker testified that Bank's goal was to keep GVF in business long enough to afford sufficient time for GVF to find another lender, and that Bank maintained this position for the duration of its relationship with GVF. GVF had gradually improved somewhat during Peasley's tenure: a net loss exceeding $4,000,000 for the fiscal year ending January 31, 1987, a net loss of over $1,000,000 for the fiscal year ending January

31, 1988, and a net operating profit of $78,000 for the fiscal year ending January 31, 1989. However, it had been necessary during 1988 for GVF to undertake an informal (*i.e.,* out-of-court) reorganization in order to deal with some $3,000,000 in debts owed to growers. Peasley testified that, when he became President of GVF in February 1988, the company was highly leveraged, with some $20,000,000 in liabilities *versus* assets of $10,000,000, and things were so bad that he considered putting the company into Chapter 11, going so far as to get the paperwork together for a bankruptcy filing and keeping it in his desk. He opted instead to attempt the informal workout, whereby some fifteen growers forgave debt in exchange for ownership interests, which proved successful in dealing with the immediate problem of the grower payables.

Bank continued to finance GVF throughout this period, but also continued to relegate GVF to its loan adjustment group and did not retreat from its position that GVF was only being kept afloat until it could find another source of financing. Tucker testified that, on December 11, 1989 (when Silva signed the first subordination agreement for the 1990 season), the principal balance owed by GVF to Bank was $10,399,174.39 and that, on April 24, 1990 (when Silva signed the corrected subordination agreement), the principal balanced owed by GVF to Bank was $5,362,372. Tucker also testified that, when the April 1990 subordination agreement was signed, GVF had applied to Bank for an increase in its line of credit from $13,000,000 to $14,500,000, an increase that was ultimately granted. Tucker further testified that GVF's financing for the 1990 season included renewal of GVF's 1989 loan, which remained outstanding to the extent of some $4,800,000 at the time of renewal. Peasley testified that, in his experience, it was not good practice for a company to carry over old debt in this manner and that, ideally, a previous balance should be paid off before new credit is incurred. Peasley also testified that, in the Spring of 1990, when Silva signed the corrected subordination agreement, investing in GVF would constitute a "high risk" venture. Plaintiff's Exhibit 35 is a copy of GVF's audited financial statement for fiscal years 1989 and 1990, prepared by the firm of Deloitte & Touche; Note 1 of the auditor's report states:

> As shown in the financial statements, at January 31, 1990, [GVF's] current liabilities exceeded its current assets by $3,458,000 and its stockholders' deficiency was $1,741,000 and [GVF] was not in compliance with certain requirements of its financing arrangements. These factors, among others, raise doubt about [GVF's] ability to continue as a going concern without continued forebearance [sic] by its creditors.

### D. Effective Waiver Requires Full Information

■■■ Silva testified that he was aware of none of these facts when he signed the subordination agreement in December 1989, or when he signed the corrected subordination agreement in April 1990. He was not one of the growers involved in the informal reorganization, and he did not hear about that at the time it was underway or later. He did not inquire of GVF, Bank, or anyone else about GVF's past or present financial condition, and merely took Avalli at his word when told by Avalli that GVF was "doing good". He testified that he would not even have agreed to grow produce for GVF, much less subordinate his producer's lien to that of Bank, had he known about GVF's losses in the recent past, or GVF's $3,000,000 debt to growers that required the informal reorganization, or Bank's demand that GVF find another source of financing, or GVF's negative net worth, or the fact that GVF's debt to Bank could rise as high as the $13,000,000 maximum level under its line of credit (which GVF was seeking to increase to $14,500,000), or the fact that GVF still owed Bank $4,800,000 of old debt that GVF had been unable to retire when it came due. Silva testified that, had he known any one of these facts, he would not have agreed to do business with GVF at all, and certainly not under terms requiring him to do so on credit with no protection but a lien subordinated to an already huge and potentially enormous undersecured bank loan.

■ Even if Silva had been able to read the April 1990 subordination agreement (or had it read to him, as Bank urges he ought to have done), that document does not, on its face, provide enough information to permit a reader to form a full understanding of what is being given up, as is required for an effective waiver. The agreement does specify that the producer's lien provided by the Food & Ag.Code is among those being subordinated, and does state that, in the absence of subordination, a producer's lien enjoys senior priority. All that is said about what the producer's lien is being subordinated to, however, is a description of it as "the security interest granted by [GVF] to [Bank] in all of [GVF's] inventory and accounts receivable, whether now owned or hereafter acquired". Without some indication of what that security interest represents in concrete terms, the subordination agreement cannot, as a matter of law, constitute an effective waiver, because it does not impart sufficient information to enable a waiving party to form a full understanding of the effect of subordinating a producer's lien. One who subordinates to the interest of a vastly oversecured creditor relinquishes very little (or nothing) of value, since priority is unimportant where the assets are sufficient to cover all liens and security interests. Subordination to the interest of an undersecured creditor, on the other hand, constitutes a loss of priority that is of paramount value, since priority determines which secured creditors can be paid before the assets are exhausted. The GVF subordination agreement does not even state the magnitude of the existing debt owed to Bank, let alone the debt's relationship to the value of the collateral, so that no one signing this document would be apprised by the document itself of what is being waived by the act of subordination: a priority position that matters not at all, or one of overwhelming importance, or something in between? Had

this agreement at least disclosed that the existing debt to Bank was $5,000,000, or that the debt to Bank could potentially reach $13,000,000 (or more), a reader would have been alerted to the fact that taking a back seat to Bank meant deferring to a very substantial amount of debt, with all attendant risks. In that case, even Silva, who can read numbers and who habitually looked at them when they appeared in contracts, would have been given some idea of what he was subjecting himself to by waiving his right to a senior priority position.

> [I]t is settled law in California that a purported "waiver" of a statutory right is not legally effective unless it appears that the party executing it had been fully informed of the existence of that right, its meaning, *the effect of the "waiver" presented to him,* and his full understanding of the explanation. (emphasis supplied)

*Bauman,* 30 Cal.App.3d at 758, 106 Cal.Rptr. 889, cited with approval by *Hittle.* The subordination agreement as written does not fully inform a reader of the effect of ceding a senior priority position.

This deficiency might be overcome if a waiving party had actual knowledge of the facts necessary to formation of a full understanding of what is being waived, from a source other than the document itself. There is no evidence that Silva possessed any such independent knowledge.[8]

■ This Court recognizes that the financing requirements of agriculture processors might frequently dictate the use of agreements subordinating producers' liens, and the decision in this case is not intended to discourage such practices. Rather, this Court believes that subordination of lien priority is properly viewed as a waiver of rights and, as such, can only be accomplished after disclosure that is sufficient to support an *informed* relinquishment of priority by the

---

8. In addition to being ignorant of the facts, it is apparent that Silva did not even know the meaning of the term "subordination" when he signed the April 1990 subordination agreement. His experience with Watsonville Canning left him with the impression that, regardless of the subordination agreement in that case, the collateral did in fact belong to him and there was never any doubt about it. Even now, Silva does not

appear to appreciate that, by subordinating his lien in the Watsonville Canning case, he exposed himself to the risk of losing rights in the collateral. His view seems to be that the effect of that subordination was to force him to hire an attorney and wait two years to recover the collateral, not that his producer's lien was jeopardized by the existence of the subordination agreement.

subordinating party. Counsel for Bank has argued that the Court should specify what information must be disclosed, if the Court finds the disclosure in the instant case to inadequate. However, the amount and type of information necessary to accomplish adequate disclosure depends on the facts, circumstances, and context of each transaction. This Court declines to craft a *pro forma* subordination agreement designed to serve the requirements of any and all agricultural financing situations that might ever arise; if such an undertaking is to be attempted, it is the function of the legislature, not of the judiciary. Until and unless statutory mandates are enacted, processors & /or lenders should determine what information is needed to demonstrate the effect of a waiver under the facts of their own particular situations. The drafters of subordination agreements are in a position to make those determinations, and it does not strike this Court as imposing an undue or impractical burden upon agricultural financing to require sufficient disclosure in such agreements.

### E. Inquiry

Bank maintains that Silva could have learned about GVF's financial history and condition, and about the status of the debt to Bank, by inquiry. Under *Bauman* and *Hittle,* the burden is upon the one requesting a waiver to offer full information and explanation, not upon the one performing a waiver to ask for such information and explanation. Moreover, it is apparent from the evidence that Silva was not put on notice of the need to inquire and, indeed, was effectively dissuaded from inquiring. Silva received the subordination agreement accompanied by assurances from his boyhood friend that it "guaranteed" payment to him from funds provided by Bank and that GVF was "doing good" financially. Throughout his long farming career, Silva has done business in the form of a handshake, or by trusting processors' field men to tell him the truth about contracts, with only one problem ever arising (the Watsonville Canning case in 1985); indeed, his first transaction with GVF during the prior year had proceeded as he expected it to and he had been paid in full. Silva's favorable experience in dealing with pro-

cessors had not taught him to be suspicious of their representations, or that he had to verify what they said by contacting banks. In this situation, he was dealing directly with Avalli, whom he had known well for some thirty years and had no reason to distrust, and who was an officer, director, and owner of the company. When Silva did point out to Avalli that he considered subordination agreements to be "no good", based on what had happened with Watsonville Canning, Avalli assured him that this particular subordination agreement would do Silva "no wrong", that in fact it "guarantee[d]" Silva would be paid, and put the transaction in terms of Silva merely having to trust Avalli for ten days. In purporting to explain the agreement to Silva, nothing was said about re-positioning Silva's lien behind Bank's security interest (with no duty for Bank to marshal its collateral), or that the debt to Bank was already up to $5,000,000 and could go as high as $13,000,000 (or higher), or that GVF's assets were worth substantially less than its liabilities. Instead, Avalli and Brooks affirmatively undertook to forestall any concerns that might have occurred to Silva by painting a rosy picture that was not true and remaining mute about anything that might cause Silva to question the wisdom of the transaction. Why, under all of these circumstances, should Silva have thought it necessary to inquire of anyone about anything? He reasonably believed that he had just been told, by a trustworthy source who was in a position to know, what the subordination agreement meant and how it was to operate. Not only was Silva under no duty to make inquiry, he had no reason to do so.

### VI.

### RESCISSION

Silva argues that the subordination agreement is subject to rescission due to fraud, pursuant to CC § 1692. The alleged fraud consists of statements made, and those that Silva contends should have been made but were not, by Avalli and Brooks in connection with Silva's execution of the subordination agreement, as summarized above.

### A. Parol Evidence Rule

 Bank objects to evidence of any contemporaneous oral statements that vary or contradict the subordination agreement, pursuant to the parol evidence rule, CCP § 1856(a). This Court has previously found that the subordination agreement constitutes an integrated document for purposes of the parol evidence rule. The issue is whether oral statements of Avalli and Brooks vary or contradict the terms of that document. The statements to which Bank objects are those that the subordination agreement would "guarantee" Silva payment within ten days. The parol evidence rule is sparingly applied in California, *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co., Inc.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968); *Trident Center v. Connecticut General Life Ins. Co.,* 847 F.2d 564 (9th Cir.1988), but remains good law, even when the evidence in question is offered to prove fraud, *Bank of America v. Pendergrass,* 4 Cal.2d 258, 48 P.2d 659 (1935) (*"Pendergrass"*). In this case, the subordination agreement neither expressly states nor implies that Silva will be paid by GVF within ten days, and does not provide for a "guarantee" of payment at any time. What it states on the subject of payment is:

> This subordination does not prohibit payments by Buyer in accordance with the payment terms contained in any contract for the purchase of farm products between Buyer and Seller. However, if such payments are not made by Buyer, Seller shall have no right to enforce any lien subordinated pursuant to this Agreement until all obligations of Buyer to WFB, whether now existing or hereafter incurred, have been paid in full.

According to Silva's testimony, Avalli's statement on this subject was:

> He said that it guarantees you—you're going to get your money. The bank has guaranteed the money is going to be there for the tomato crop.... And, then they'll pay me in ten days and he said "You only have to trust me for ten days and you'll have your money; can you trust me for ten days?"

The context of Avalli's statement as it is presented by Silva indicates that Avalli was describing an effect of the subordination agreement—that Bank had guaranteed that funds would be available for GVF—and then promising Silva that GVF would honor its contract with Silva and pay him within ten days. Avalli's statement concerning payment by GVF to Silva does not vary or contradict the terms of the subordination agreement, which expressly provides that it permits GVF to make payments to Silva in accordance with the terms of its contract with him. Avalli's statement that Bank had guaranteed that money would be available for GVF also does not vary or contradict the subordination agreement, which expressly provides that subordination is "[i]n consideration of the extension of credit by [Bank] to [GVF]", and also that "[Silva] acknowledges that [Bank] will be relying on the effectiveness of this subordination in making loans to [GVF], to enable [GVF] to have a need to purchase tomatoes from [Silva]". The oral statements that Bank objects to do not constitute "a promise directly at variance with the promise of the writing", *Pendergrass,* 4 Cal.2d at 261, 48 P.2d 659, such as to invoke the parol evidence rule.

### B. Fraud

 The elements of fraud are: a misrepresentation, which includes false representation, concealment, and nondisclosure; knowledge of the falsity; intent to deceive; justifiable reliance by the aggrieved party; and resultant damage. 5 Witkin, *Summary of California Law* (9th ed.), § 676. Silva maintains that false statements were made to him and that material information was withheld from him, knowingly, with the intent to deceive, and that he justifiably relied upon these misrepresentations to his detriment.

#### 1. Misrepresentation by GVF

Since neither Avalli nor Brooks testified, the Court had no opportunity to assess their credibility by observation of their demeanor, and the record reflects only Silva's presentation of what he was told and a transcript of Avalli's deposition. Silva was a credible witness and the Court believes that he truthfully related what was and was not said to him, to

**668**

the best of his recollection and understanding.

 Bank focuses on what was said to Silva, both in its parol evidence objection and in asserting that it was unreasonable and unjustifiable for Silva to rely upon the oral statements, rather than having the written contract read to him. However, fraud does not consist only of affirmative lies—it can also consist of deliberate silence with respect to information that ought to be revealed. Taken alone, the oral statements that were made to Silva might be characterized as mere "salesman's puff", or a "sales pitch", rather than a deliberate attempt to deceive (although they do not create such an impression upon this Court). It could even be argued that Avalli and Brooks truly believed that GVF was finally pulling out of a bad spell, having just successfully restructured $3,000,000 of debt to growers and begun to show profits; this may not amount to "doing good" in the sense that Silva understood it, but it was certainly doing better in comparison to GVF's dismal track record. In making the oral statements, however, Avalli and Brooks knew all about GVF's severe financial problems in the recent past, which had not yet been fully overcome, and they did not impart any of that information to Silva. Silva testified that he would not have agreed to do business with GVF on credit terms had he known of the company's past and present financial condition, including the magnitude of the Bank lien. Not only was that testimony credible, it is consistent with what this Court believes would be the reaction of any reasonable person—in truth, the nature of the transaction between GVF and Silva was that of a huge gamble on Silva's part, a "high risk" venture, as Peasley himself put it. It is inconceivable that Avalli and Brooks would not expect any potential grower to be reluctant, at the least, to extend credit to GVF under the circumstances that existed in December 1989 and April 1990. Even if the affirmative statements were charitably viewed as mere optimism rather than outright misrepresentation, the fact remains that an abundance of material information was not disclosed at all. An intent to deceive can be inferred from the mere fact of false representations having been made, *Matter of*

*Nelson,* 561 F.2d 1342 (9th Cir.1977), and it appears to this Court that Avalli and Brooks must have been motivated to remain silent about GVF's problematic and uncertain financial condition by concerns that no reasonable person would agree to do business with GVF if the truth were known.

### 2. Reliance by Silva

 Silva's reliance was "justifiable" under the subjective standard of *In re Kirsh,* 973 F.2d 1454 (9th Cir.1992), and *Seeger v. Odell,* 18 Cal.2d 409, 115 P.2d 977 (1941) (*"Seeger"*): "justifiable" reliance is that which is reasonable for the particular person involved, in the light of such circumstances as unequal knowledge and expertise. Even if Silva had been able to read the subordination agreement, or had it read to him, it would not have apprised him of the context in which the subordination would operate— *i.e.,* extending unsecured credit to a financially distressed company already burdened by overwhelming secured debt—and Silva had no independent knowledge of those facts. Avalli and Brooks, however, did know about GVF's history and current condition. This situation is similar to that in *Cortez v. Weymouth,* 235 Cal.App.2d 140, 45 Cal.Rptr. 63 (1965), in which the plaintiffs were immigrants with a poor grasp of the English language and inexperienced in business matters, while the defendants spoke fluent English and were veteran real estate brokers and lenders who knew of the plaintiffs' ignorance. Silva had no reason to suspect falsehoods and concealments from Avalli and every reason to believe Avalli and trust him to tell Silva the truth. The subjective test of justifiable reliance does not permit one to "put faith in representations which are preposterous, or which are shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth", *Seeger,* 115 P.2d at 981, but there is nothing "preposterous" about the incomplete story that Silva was told, nor were contrary facts within Silva's observation.

### C. Reliance by Bank as Defense to Rescission

 Bank argues that rescission of the subordination agreement should not be per-

mitted due to Bank's reliance upon the agreement's validity. Tucker testified that Bank relied upon the agreement in the sense that, had Silva not signed the subordination agreement, or had Bank realized that the agreement was not enforceable, Bank would not have included the product delivered to GVF by Silva in GVF's "borrowing base", such that less money would have been loaned by Bank to GVF (Tucker did not quantify the amount that Bank would have refrained from lending). Bank cites a "maxim of equity" found in CC § 3543: "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer", characterizing Bank and Silva as two innocents and Silva as the negligent party. As discussed above, this Court does not consider that Silva was negligent, but, rather, that he justifiably relied upon the GVF personnel's incomplete representations. In applying equitable considerations, it must also be borne in mind that the subordination agreement—which made no disclosures about GVF's condition and would not have enlightened Silva even if he had been able to read it, or had it read to him— was drafted by Bank.

### D. Laches by Silva

■■■■ Bank complains of laches, as Silva did not inform Bank that he intended to rescind the subordination agreement until some fourteen months after GVF breached its contract with Silva. Laches requires both an unreasonable delay by the plaintiff and resultant prejudice to the defendant, see generally, 30 Cal.Jur., Equity § 41 et seq. (3rd ed. 1987).

Silva's delay does not strike this Court as unreasonable under the circumstances. Silva testified that, during roughly twelve of those fourteen months, he was either receiving sporadic partial payments or being told by Avalli and/or Peasley that GVF was doing its best to pay him; he finally received a letter dated April 10, 1991, in which GVF stated that, while unable to make a definite commitment, it "anticipated" paying him in full by September 30, 1991. It was not until shortly after that proposed payment date that Peasley told Silva that GVF was out of money and Peasley did not know what to do about it.[9] Silva testified that he had what he estimated to be some thirty telephone conversations with Peasley during the approximately one year that elapsed between the time GVF first failed to pay him within ten days post-delivery and the time that Peasley finally admitted GVF's inability to make any further payments. It was not unreasonable for Silva to defer taking legal action while GVF was demonstrating an effort to honor its contract with him.

As to prejudice, there is scant evidence that Bank was in fact prejudiced by any delay of Silva's or, if so, whether to a major, or only to a minor, extent. Tucker testified that "if Mr. Silva's [subordination agreement] wouldn't have been valid that would probably lead us to believe that no others would be valid, either, and we would then find ourselves wondering what to do about it and how to perfect ourselves in the collateral". This is pure speculation on the part of Tucker that, had Silva sought rescission earlier, Bank would "probably" have been alerted to issues concerning the enforceability of GVF's subordination agreements with others, in which case, Bank would then "wonder[ ] what to do about it", and there is no evidence that Bank has in fact suffered any damage flowing from subordination agreements between GVF and other growers, nor that any such damage that might exist could have been obviated if Silva had complained fourteen months sooner than he did. Tucker also testified that, had Bank "known that [the subordination agreement] would not be valid, then we would have excluded the amounts from the borrowing base", but there is no evidence that, had Silva sought rescission immediately upon GVF's breach, Bank would actually have adjusted the amount of future advances to accomplish retroactive exclusion of Silva's product from GVF's "borrowing base", or been able to do so as a practical matter; nor is there any evidence of the extent of advances made to GVF that Bank might have avoided if Silva had not waited to

---

9. What GVF ultimately did do about it was file a Chapter 11 petition less than six weeks later, culminating in conversion to Chapter 7 in approximately six months' time.

contest the validity of his subordination agreement, so it cannot be determined whether any such damages were substantial or nominal.

Neither unreasonable delay on the part of Silva nor demonstrated prejudice to Bank appears under the facts of this case.

## VII.

### FAIRNESS AND REASONABLENESS

■ Silva urges that the subordination agreement is unenforceable because it is not "fair and reasonable" as to him. The only authority for this ground that is cited by Silva, and that has been located by the Court, involves actions for specific performance of subordination agreements pertaining to real property: *Handy v. Gordon,* 65 Cal.2d 578, 55 Cal.Rptr. 769, 422 P.2d 329 (1967); *Loeb v. Wilson,* 253 Cal.App.2d 383, 61 Cal.Rptr. 377 (1967); *Roskamp Manley Associates, Inc. v. Davin Development & Investment Corp.,* 184 Cal.App.3d 513, 229 Cal.Rptr. 186 (1986); *and see,* CC § 3391, providing that specific performance cannot be enforced against a party to a contract that is not, "as to him, just and reasonable". The remedy of specific performance is limited to situations in which the plaintiff cannot be compensated adequately by an award of money, *see generally,* 9 Miller & Starr, *Current Law of California Real Estate* (2d ed. 1990) § 30:9, and cases cited therein. Silva's action is not one for specific performance, nor would he be entitled to such relief, as monetary damages would adequately compensate him. There appears to be no authority for the proposition that "fairness and reasonableness" *per se* are essential elements for a contract that is enforceable by means other than by a decree for specific performance.

■ Rather, the test for general enforceability of a contract includes a requirement that the contract not be unconscionable, CC § 1670.5, *and see, Patterson v. ITT Consumer Financial Corp.,* 14 Cal.App.4th 1659, 18 Cal.Rptr.2d 563 (1993) (*"Patterson"*) for a discussion of alternative analyses of the concept of unconscionability, both of which should lead to the same result, *Patterson,* 18 Cal.Rptr.2d at 565, *Perdue v. Crocker National Bank,* 38 Cal.3d 913, 216 Cal.Rptr. 345, 702 P.2d 503 (1985). Silva does not allege unconscionability as such, nor does it appear that the subordination agreement rises (or sinks) to that level. Under either of the methods of analysis addressed in *Patterson,* unconscionability includes an element of oppression, which "results where there is no real negotiation of contract terms because of unequal bargaining power", *Patterson,* 18 Cal.Rptr.2d at 565, *A & M Produce Co. v. FMC Corp.,* 135 Cal.App.3d 473, 186 Cal. Rptr. 114 (1982). Inequality of bargaining power for Silva has not been demonstrated. First, it was GVF that approached Silva, wanting 30,000 tons of tomatoes to increase its output, not the other way around; there is no evidence that Silva was actively seeking a market for his produce, or needed GVF. Further, it cannot be known whether GVF would have declined to contract with Silva for the 1990 crop year if Silva had been unwilling to sign the subordination agreement, because Silva did not refuse to sign it. Tucker testified that subordination agreements were not a condition of Bank's financing GVF, but did affect the amount of financing that Bank made available to GVF. Bank established a "borrowing base" and loaned GVF a percentage of that figure; the "borrowing base" consisted of GVF's assets available to serve as collateral, as valued by Bank, and did not include any inventory that was subject to an unsubordinated producer's lien. Peasley testified that it was unusual for GVF to buy from a grower who would not subordinate, unless GVF had a particular need for that grower's product. It may be that GVF would have refused to buy from Silva if he had not agreed to subordinate, or it may be that GVF had no other source for 30,000 tons of tomatoes and wanted them badly enough to forgo subordination had Silva refused; the issue never developed, and so was never addressed by the parties.

The appropriate standard for enforceability of the subordination agreement is not whether it was fair and reasonable, but whether it was unconscionable, which it was not shown to be. The subordination agree-

ment is not, therefore, unenforceable on that basis.

## VIII.

### AGENCY AND ACTS OF BANK

 At various stages of these proceedings, Bank has insisted that GVF and its personnel did not act as Bank's agent or on behalf of Bank in dealing with Silva, and pointed out that Bank itself never had any direct dealings with Silva. There is no evidence to the contrary, and the Court accepts Bank's position (which has never been seriously disputed by Silva).

These points are, however, irrelevant to these proceedings, because Silva's entitlement to relief does not depend upon any relationship of agency or the like between Bank and GVF, or upon any act of Bank's. Rather, the subordination agreement constitutes a third party beneficiary contract between GVF and Silva, from which Bank derives a benefit, *Martinez v. Socoma Companies, Inc.*, 11 Cal.3d 394, 113 Cal.Rptr. 585, 521 P.2d 841 (1974); *Marina Tenants Association v. Deauville Marina Development Co.*, 181 Cal.App.3d 122, 226 Cal.Rptr. 321 (1986) ("*Marina*"). As such, if it is unenforceable by GVF against Silva, it is equally unenforceable by Bank against Silva, *Marina, Protective Equity Trust # 83, Ltd. v. Bybee*, 2 Cal.App.4th 139, 2 Cal.Rptr.2d 864 (1991). Silva's complaint seeks to have the subordination agreement declared unenforceable based on its own deficiencies, and/or the provisions of the Food & Ag.Code, and/or public policy, and/or the acts of GVF. Such relief requires no finding of wrongful acts, or acts of any kind, on the part of Bank, nor any finding of agency or similar relationship between Bank and GVF. No such findings are made.

## IX.

### CONCLUSION

The subordination agreement signed by Plaintiff on April 24, 1990 (replacing that signed by Plaintiff on December 11, 1989) constitutes a waiver of the senior priority position of the producer's lien held by Plaintiff, pursuant to the provisions of the California Food and Agriculture Code, which waiver is ineffective as a matter of law due to Plaintiff not having been fully informed of the effect of such a waiver. If the subordination agreement were not an ineffective waiver, but an enforceable contract, it would be subject to rescission by Plaintiff on the basis of fraud by GVF. Plaintiff's producer's lien is therefore not subordinated to the security interest of Defendant Wells Fargo Bank in the property subject to Plaintiff's producer's lien and in the proceeds of such property. Plaintiff shall have judgment so providing. Counsel for Plaintiff shall submit a form of judgment consistent with this Memorandum Decision, reviewed as to form by counsel for Defendant Wells Fargo Bank.