[No. B013359. Second Dist., Div. Six. July 28, 1986.]

ROSKAMP MANLEY ASSOCIATES, INC., Plaintiff and Appellant, v. DAVIN DEVELOPMENT AND INVESTMENT CORPORATION, Defendant and Respondent.

514

**COUNSEL**

Miller & Folse and Christopher W. Patterson for Plaintiff and Appellant.

Nordman, Cormany, Hair & Compton and Glen M. Reiser for Defendant and Respondent.

**OPINION**

**STONE, P. J.**—Roskamp Manley Associates, Inc. (Manley) appeals from an order granting summary judgment to Davin Development and Investment

Corporation (Davin) and dismissing Manley's complaint. (Code Civ. Proc., § 437c, subd. (*l*).) The principal issue concerns whether the subordination agreement in the escrow instructions was enforceable. We hold it was not and affirm the judgment.

## FACTS

In July 1984, Manley, a real estate developer, offered to purchase Davin's property for $450,000 with $225,000 secured by a purchase money deed of trust. Also, the "Seller agrees to subordinate to a construction loan." The parties exchanged various counteroffers, and finally agreed upon a $525,000 purchase price, including a cash down payment of $275,000 and a $250,000 purchase money deed of trust. Original escrow instructions signed by the parties made no mention of subordination. When Manley requested a subordination agreement be included in escrow, Davin's broker submitted a supplemental escrow instruction to Davin stating that Seller would execute all documents required to subordinate Seller's trust deed to a subsequent construction loan secured by a first deed provided that the following conditions were met: (1) Buyer would not be in default under any terms or conditions of either the note or trust deed; all taxes were paid and there were no further liens on the property; (2) Seller shall approve the "total principal amount" of the construction loan; and (3) All funds disbursed under the construction loan shall be used only to pay for material and labor directly incorporated into the improvements. Davin signed the instruction August 31, 1984.

November 8, 1984, shortly before the deadline to remove escrow contingencies, Manley provided Davin with a subordination agreement which deleted Davin's right of approval of the principal amount of the construction loan and substituted a term which placed no limitation upon the principal amount, so long as the loan did not exceed 80 percent of the lender's appraised value of the completed project.

Davin objected to the substitution provision and attempted to cancel escrow. At this juncture, Davin sought legal counsel,[1] who opined that the subordination agreement delineated in the supplemental escrow instruction of August 31, 1984, was unenforceable. After attempts to negotiate acceptable terms to the subordination agreement failed and Manley refused to proceed without a subordination clause, Davin cancelled escrow and offered to return Manley's $5,000 deposit. Manley sued for specific performance or damages and for declaratory relief.

---

[1]Apparently, Davin was not aware that Manley signed Davin's supplemental escrow instruction until Manley opposed Davin's motion for summary judgment.

DISCUSSION

1. *Subordination Agreement Not Enforceable as a Matter of Law.*

■ A subordination agreement alters the priority of interests in or liens upon real property. A beneficiary of a deed of trust can agree that his lien is to be junior in priority to the lien of another deed of trust created and recorded subsequently. (2 Miller & Starr, Current Law of Cal. Real Estate (1977) § 11:170, p. 240.) Subordination agreements are useful in real estate development since institutional lenders generally are limited to loans secured by a first lien. (See Fin. Code, §§ 1227 and 1560.) Such agreements are "in the nature of a mutual enterprise, wherein the vendor provides the land, the purchaser the 'know-how' and the purchaser's lending agency the capital for the mutually beneficial purpose of developing the land and disposing of it (usually by sale) to provide a fund out of which the vendor is paid for his land, the lender is repaid its loan with interest, and the purchaser receives compensation for his efforts and skill." (*Woodworth* v. *Redwood Empire Sav. & Loan Assn.* (1971) 22 Cal.App.3d 347, 361 [99 Cal.Rptr. 373].)

However, there are unique risks involved in a seller's subordinating his purchase money lien to construction financing—risks which make the seller's position vulnerable. (*Budget Realty, Inc.* v. *Hunter* (1984) 157 Cal.App.3d 511, 516 [204 Cal.Rptr. 48].) Unlike the standard transaction where the purchaser plans to make the same or similar use of property, and the present worth is a reliable indicator of its fair market value, where the purchaser intends to develop the property for a different use, the ultimate value will be determined by the success of the venture. (*Spangler* v. *Memel* (1972) 7 Cal.3d 603, 613 [102 Cal.Rptr. 807, 498 P.2d 1055].) Moreover, because construction loans are relatively large, a seller may be unable to raise the large sums of money necessary to buy in at the senior sale to protect his security. (*Ibid.*) Also, since construction financing is short-term, subordination to construction financing substantially aggravates the jeopardy to the seller's security. (*Budget Realty, Inc.* v. *Hunter, supra,* at p. 516.)

■ Manley contends the subordination agreement sufficiently restrictive to "define and minimize the seller's risk" and was fair and reasonable to seller. (See *Handy* v. *Gordon* (1967) 65 Cal.2d 578, 581 [55 Cal.Rptr. 769, 422 P.2d 329].) Davin maintains that, to be enforceable, a subordination agreement must specify at least the maximum principal, maximum interest rate, maximum term and mode of repayment of the new loan. (See 2 Miller & Starr, Current Law of Cal. Real Estate, *supra,* § 11:178 at p. 249; Cal.

Real Property Sales Transactions (Cont.Ed.Bar 1981) § 5.43, at pp. 389-390.)

According to Miller & Starr, "The courts have established certain guidelines in determining the terms of the new loan which the seller will be required to accept as a prior lien. Although the authorities are not consistent, [fn. omitted] to be enforceable the subordination agreement must *at least* specify the maximum principal, maximum interest rate, maximum term, and the mode of repayment of the new loan. [Citing *Cummins* v. *Gates* (1965) 235 Cal.App.2d 532 (45 Cal.Rptr. 417).] Agreements less specific than this have been held to be unenforceable. [Fn. omitted.] [¶] However, even if each of these matters is clearly specified, the agreement still may not be enforceable. The test of enforceability is the fairness and reasonableness of the agreement to the seller. [Citing *Handy* v. *Gordon, supra,* 65 Cal.2d 578; *Loeb* v. *Wilson* (1967) 253 Cal.App.2d 383 (61 Cal.Rptr. 377).]" (Pp. 249-250.)

Other desirable provisions include limiting terms of the new loan and disbursements; minimum prepayment terms as well as maximum to avoid a burdensome balloon payment; purpose of the loan and restriction on use of funds to construct improvements on the property; amount of loan fees and costs to be covered by loan proceeds; description of improvements, and possible additional assurance that buyer has a firm commitment for a "take out" or permanent loan. (Cal. Real Property Sales Transactions, *supra,* § 5.43, pp. 389-390; Miller & Starr, *supra,* at pp. 251-252.)

Manley contends these authorities are in error and cites *Stockwell* v. *Lindeman* (1964) 229 Cal.App.2d 750 [40 Cal.Rptr. 555] for support. There, the court found enforceable a subordination agreement which stipulated only the maximum amount of loan and maximum interest.

According to Manley, *Stockwell* was a "landmark" case and one of the first to recognize the practical difficulties of drafting an enforceable subordination agreement concerning future loans.

In *Stockwell,* the subordination agreement provided that the construction loan was not to exceed $80,000 with interest not to exceed 7.5 percent per annum, payable at such times and upon such conditions as are required by the lender. The court found the agreement sufficiently certain to be specifically enforceable and noted that the modern trend is to favor enforcement of contracts, neither law nor equity requiring every term to be set forth. (*Id.,* at p. 757.) It also noted that, since details of future loans might not

be known in advance, to require specificity regarding amount of monthly installments and exact duration of loan to be anticipated and stated in the sales agreement would unduly burden the parties. (*Id.*, at p. 758.)

Nevertheless, the court in *Stockwell* stated that of greatest importance was the maximum amount of the construction loan based on either percentage of construction costs, or in an agreed amount and maximum interest rate, since those items most directly affect the security of the property for repayment. According to *Stockwell,* nothing should be left for the parties' future agreement. (*Id.*, at p. 757.)

In *Handy* v. *Gordon, supra,* 65 Cal.2d 578, defendant vendor agreed to sell land to plaintiff developer for $1.2 million at 2 percent interest per year, payable in annual installments of $120,000, beginning three years after close of escrow, the balance due in ten years. Sellers agreed to subordinate their trust deed to other trust deeds securing construction loans. Terms of subordination were: loans in maximum amounts of $10,000 and $52,000 per lot, and maximum interest rate of 7 percent and 6.6 percent, to mature in not less than 6 and 35 years respectively. The contract did not specify the number of lots. Plaintiff sued for specific performance, and judgment on the pleadings for defendants was affirmed. The court stated: "Although the parties to a contract of sale containing a subordination clause may delegate to the vendee or third party lenders power to determine the details of subordinating loans, an enforceable subordination clause must contain terms that will define and minimize the risk that the subordinating liens will impair or destroy the seller's security. [] Such terms may include limits on the use to which the proceeds may be put to insure that their use will improve the value of the land, maximum amounts so that the loans will not exceed the contemplated value of the improvements they finance, requirements that the loans do not exceed some specified percentage of the construction cost or value of the property as improved, specified amounts per square foot of construction, or other limits designed to protect the security. Without some such terms, however, the seller is forced to rely entirely on the buyer's good faith and ability as a developer to insure that he will not lose both his land and the purchase price. Even if we were to assume that a contract of sale contemplating subdivision by the vendee is sufficiently different from the usual land sale contract to take it out of the operation of the anti-deficiency legislation [], the personal liability alone of the vendee would not constitute sufficient protection to the vendor to permit specific performance." (*Id.*, at p. 581.)[2]

---

[2]In *Spangler* v. *Memel, supra,* 7 Cal.3d 603, the California Supreme Court ruled that an executed subordination agreement removes a land sales contract for commercial development from the operation of the anti-deficiency legislation. (Code Civ. Proc., § 580b.)

In *Handy,* the court found the contract did not afford defendants any additional protection since not all of the loan proceeds were to be used for construction, there was no assurance that the amounts of the loans would not exceed the value the improvements added to the security, and defendants were not assured that the total amount of the subordinating loans would be kept low enough to enable them to protect themselves by bidding on the property if the senior liens were foreclosed. (*Id.,* at p. 582.) The court agreed with defendants, that as to them, the contract was not "just and reasonable" as a matter of law. (*Id.,* at p. 581.)

Manley asserts that the test of fairness is the standard by which enforceability of subordination agreements is currently measured and that since *Stockwell* and *Handy,* cases emphasizing contractual certainty of terms are now obsolete, and should no longer be controlling.[3] Our review of cases—including *Handy*—decided after *Stockwell* do not lead us to that conclusion. ■ Rather, the Supreme Court in *Handy,* faced with a specified maximum loan amount, maximum interest rate, maximum term and mode of repayment, realized that specificity in terms is not enough. An additional consideration is necessary—that the agreement be "just and reasonable to the purchase money seller." (55 Cal.2d at p. 582.) Thus, whereas the concept of fairness may be important, it needs definition to be meaningful. Although specificity in terms may not be the sine qua non of enforceability (see *Loeb* v. *Wilson, supra,* 253 Cal.App.2d 383), that is not to say a court should avoid examining contractual certainty in terms when deciding reasonableness and fairness to the seller.[4]

■ Manley presented the trial court with a list of terms which it asserted could be reasonably implied by custom and usage to interpret the agreement as enforceable. ■ The law regarding subordination clauses is but an application of the general principle that where a party seeks specific performance of a contract for the sale of real property, terms must be complete and certain in all particulars essential to its enforcement and must express each material term in a reasonably definite manner. (*Krasley* v. *Superior Court* (1980) 101 Cal.App.3d 425, 431 [161 Cal.Rptr. 629].) No material element must be left to future agreement. (*Ibid.*) Although evidence of custom and usage may be introduced to interpret a contract, it may not be used to create one. (*Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d

---

[3]Cases to which Manley alludes are *Gould* v. *Callan* (1954) 127 Cal.App.2d 1 [273 P.2d 93]; *Roven* v. *Miller* (1959) 168 Cal.App.2d 391 [335 P.2d 1035]; *Kessler* v. *Sapp* (1959) 169 Cal.App.2d 818 [338 P.2d 34]; *Conley* v. *Fate* (1964) 227 Cal.App.2d 418 [38 Cal.Rptr. 680]; and *Magna Development Co.* v. *Reed* (1964) 228 Cal.App.2d 230 [39 Cal.Rptr. 284].

[4]The "just and reasonable" standard also is dictated by Civil Code section 3391.

230, 238.)[5] The parties may agree, however, to leave additional terms to the discretion of one of them or to a third party, such as the lender. (See *Handy* v. *Gordon, supra,* 65 Cal.2d 578; *Stockwell* v. *Lindeman, supra,* 229 Cal.App.2d 750; *Cummins* v. *Gates, supra,* 235 Cal.App.2d 532; *Simmons* v. *Dryer* (1963) 216 Cal.App.2d 733 [31 Cal.Rptr. 199].)

Although we are not convinced there is a magic number of terms, the minimum of which will insure a just and reasonable subordination clause as a matter of law, the agreement must contain sufficient terms from which a court can ascertain its fairness to the seller, even assuming some matters may be left to custom and usage. "In such a situation the security of the seller's subordinated deed of trust is of paramount importance." (*Thomas* v. *Fox* (1982) 128 Cal.App.3d 361, 366 [180 Cal.Rptr. 253].) Did the parties' agreement here pass muster?

Manley contends Davin was given adequate protection in the form of $250,000 down payment, the loan proceeds being used for labor and materials in the construction, and Davin's complete control of the principal amount. We disagree.

As the parties and the trial court recognized, Davin could not withhold his consent to a reasonable principal amount. (See generally *Kadner* v. *Shields* (1971) 20 Cal.App.3d 251 [97 Cal.Rptr. 742].) Manley argued to the trial court that 75 percent or 80 percent of the fair market value of the completed project was a reasonable principal amount. The trial court can determine "fair market value" without future agreement of the parties. (See *Goodwest Rubber Corp.* v. *Munoz* (1985) 170 Cal.App.3d 919 [216 Cal.Rptr. 604].) Appraisers or lenders could establish the maximum loan allowable for a given fair market value. However, if the reasonable principal amount is determined to be 75 percent or 80 percent of fair market value of the improved property, Davin would be forced to agree to a percentage which he expressly refused to accept at time of escrow. The only term to which Davin would have expressly agreed and over which he would have control is that the loan proceeds be used for material and labor. "If the improvements are not built as planned, the property will not increase in value enough to provide adequate security for both the construction loan and the subordinate lien of the original seller." (*Hutton* v. *Gliksberg* (1982) 128 Cal.App.3d 240, 245-246 [180 Cal.Rptr. 141].)

If, for example, the proposed project were appraised at $4 million, Manley, under its theory, would be able to secure $3.2 million and Davis would have

---

[5]In *Krasley,* the court rejected an assertion similar to Manley's that custom and usage would fill the gaps.

to accept the project. If Manley defaulted during construction and filed for bankruptcy, Davin would have to pay off the senior lien or lose the remainder of its purchase price. Terms critical to Davin's protection—interest rates, repayment terms, duration of loan, size of balloon payment, whether "points" and costs were to be deducted from the loan and whether Manley had a permanent loan committed—would be beyond Davin's control. Manley contends all these terms would have to be "reasonable" or Davin could withhold his approval of the loan. However, if the principal amount itself were determined to be "reasonable," we are uncertain how much control a court would allow Davin over other terms. In that sense, Davin's "complete control" over the principal amount is illusory and, therefore, not just and reasonable.

Manley argues that fluctuating interest rates and a changing business atmosphere precludes setting a specific maximum principal amount or interest rates. Nevertheless, the parties could agree to a maximum principal amount at a percentage of appraised value of the improved property at an interest rate a certain percentage above prime or at the prevailing rate in the business community at time of construction. The problem here is that they did *not* so agree. In essence, Manley asked the trial court to set the terms of their agreement. It could not nor can we.

## 2. *No Material Issues of Fact to be Tried.*

■ Manley asserts that Davin's sophistication, or lack thereof, creates a triable issue of fact concerning custom and usage, especially since similar subordination clauses have been used successfully in the business community. We disagree. As stated *supra,* custom and usage is not admissible to *establish* a contract. (*Magna Development Co.* v. *Reed, supra,* 228 Cal.App.2d 230, 241; *Krasley* v. *Superior Court, supra,* 101 Cal.App.3d 425, 431.) Similarly, we are unmoved by the argument that others have used the same agreement with apparent success. Either those parties' plans proceeded without incident, or if their disagreements resulted in litigation, their appeals have not reached this court.

■ Manley also contends there is a triable issue of fact whether Davin dealt in bad faith or unfairly in attempting to cancel the agreement as unenforceable. According to Manley, Davin simply wished to accept a more lucrative offer and used the subordination agreement as an excuse to cancel their sales contract. Since we hold that the agreement *was* unenforceable as a matter of law, we do not find Davin's secret motives relevant. Thus, they raise no triable issue of fact.

The judgment is affirmed. Costs to respondent.

Gilbert, J., and Abbe, J., concurred.