75 Cal.Rptr.2d 151 (1998)
64 Cal.App.4th 309
GUARDIAN SAVINGS AND LOAN ASSOCIATION, Plaintiff and Respondent,
v.
MD ASSOCIATES et al., Defendants and Appellants.
No. A076962.
Court of Appeal, First District, Division One.
May 29, 1998.
Rehearing Denied June 29, 1998.
Review Denied September 2, 1998.
*152 Hoffman, Finney & Klinedinst, William P. Hoffman, Jr., Charles B. Klinedinst, San Francisco, for Defendants and Appellants.
Sedgwick, Detert, Moran & Arnold, Steven D. Roland, Randall G. Block, Michael J. McDonnell, San Francisco, for Plaintiff and Respondent.
SWAGER, Associate Justice.
MD Associates, Michael D. Barker (hereafter Barker), The Ninth and Mission Corporation and Barker-Patrinely Group, Inc. appeal from a judgment of foreclosure, entered on an order granting summary adjudication, which adjudicated two of the defendants, MD Associates and Barker, personally liable on the secured indebtedness. We affirm the judgment with respect to the principal issues on appeal, while reversing as to a minor defendant and ordering a remand for modification of the judgment.

*153 PROCEDURAL AND FACTUAL BACKGROUND
The foreclosure suit arises from cross-purchases of property in connection with the sale of property in San Francisco known as 100 First Street. We review the facts in a light favorable to appellants, consistent with the principle that affidavits opposing a motion for summary judgment are to be liberally construed. (6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial § 218, p. 630.)
In 1983, Michael D. Barker was recruited by the chairman of Guardian Savings and Loan Association (hereafter Guardian) to act as a development partner for office building projects in a territory that included San Francisco. The parties' first investment was in 100 First Street in San Francisco. The corporate parent of Guardian acquired title to the property and Guardian itself advanced some $30 million to cover land acquisition and predevelopment costs. Guardian subsequently determined that it could not advance more funds and asked Barker to find financing elsewhere for the project. Barker succeeded through a complex transaction with Delta Dental of California (hereafter Delta).
In 1985, Delta owned a building at 1235 Mission Street that served as its main office. Desiring a larger headquarters, it entered into an agreement to purchase the 100 First Street property for a price of $35 million, to finance construction of the proposed office building, and to lease the building back to a development partnership involving Barker and Guardian. At Delta's insistence, however, the agreement provided that Delta would pay part of the $35 million purchase price by transferring its existing property at 1235 Mission to the developers for an agreed price of $9.4 million. In this way, its cash outlay for purchase of the 100 First Street property was reduced from $35 million to $25.6 million.
The transaction was carried out through cross-purchases of the 1235 Mission property and the 100 First Street property. Guardian, however, did not want an ownership interest in 1235 Mission. To avoid such an ownership interest while carrying out the agreed transaction, Barker and an associate, Dean Patrinely, formed a Texas joint venture, MD Associates, to purchase the property. Guardian provided 100 percent of the financing for the purchase in a transaction giving rise to this lawsuit.
On May 30, 1986, simultaneously with Delta's purchase of 100 First Street for $35 million, Guardian loaned MD Associates the sum of $10.4 million. The promissory note of MD Associates for this amount (erroneously dated May 30, 1985) was secured by a deed of trust on 1235 Mission Street. MD Associates purchased 1235 Mission Street from Delta for $9.4in effect remitting to it $9.4 million of the $35 million purchase price Delta paid for 100 First Streetand retained the $1 million balance of the loan to cover anticipated costs associated with the property.
Delta vacated 1235 Mission Street in 1988, and although MD Associates found a temporary tenant after the 1989 earthquake, the loan went into default. In a series of documents, dated as of January 1, 1990, the parties restructured the loan secured by the property. The original $10.4 million loan was extended and modified in a "Restated Loan Agreement" and a "Reinstatement, Renewal, Extension and Modification Agreement" (hereafter Modification Agreement), which among other things transformed it into a nonrecourse loan under some circumstances. The accrued interest on the loan in the amount of $1,411.138 was separately financed as a new second loan under a promissory note, dated as of January 1, 1990, secured by a junior deed of trust on the property.
In 1990, MD Associates found a prospective long-term tenant for 1235 Mission Street, the Department of Social Services of San Francisco, which agreed to enter into a lease on condition that MD Associates make approximately $4.5 million in tenant improvements. Provided these improvements were made, the Department agreed to lease terms that would allow MD Associates to pay off the Guardian debt and finance the required tenant improvements. Guardian, however, refused to provide MD Associates with financing for the tenant improvements, and other conventional lenders would not extend the loan without a first lien on the property. As a solution to this dilemma, MD Associates *154 arranged a complicated tax-free financing plan, which involved a restructuring of the debt secured by the property.
Under this transaction, MD Associates transferred title to 1235 Mission Street to a nonprofit corporation, Ninth and Mission Corporation, which issued two series of certificates of participation, secured by the lease to the Department of Social Services. The lease was for an initial term of ten years and eight months, with two 5-year option periods. The Series A certificates for $12 million were basically secured by the initial term of the lease; the Series B certificates were secured by rentals from the two 5-year option terms. To confer tax exempt status on the certificates, the transaction with the Department of Social Services also involved a Lease Purchase Agreement with San Francisco Unified School District, by which the school district was given the right to receive fee title to the property, without further payment, at the end of the full 20-year term.
The Series A certificates could not be successfully marketed without securing from Guardian a subordination agreement giving the holder of the certificates the right to foreclose on the property in the event of a default. Though Guardian agreed to a limited subordination agreement, it refused to agree to terms desired by the prospective purchasers of the certificates. When MD Associates was unable to market the certificates, Guardian then offered to purchase the Series A certificates for $9.6 million, which was substantially less than the $12 million par value. Due to its inability to market the Series A certificates, MD Associates had no alternative but to accept Guardian's offer, and the transaction closed in 1992. MD Associates later pledged its interest in the Series B certificates as security for repayment of the first $10.4 million note and the second $1.4 million note.
The first and second notes matured on February 28, 1995, as extended by the Modification Agreement and certain later agreements. MD Associates failed to pay amounts owing under the notes, and Guardian refused any further extension. On September 22, 1995, Guardian filed a complaint for judicial foreclosure of its security interests in 1235 Mission and the pledged Series B certificates, naming appellants as defendants. Appellants filed an answer raising a series of affirmative defenses.
Guardian subsequently filed a motion for summary judgment or, in the alternative, for summary adjudication of each cause of action of the complaint and each of appellant's affirmative defenses. The trial court granted the motion for summary adjudication in orders filed September 3, 1996, and October 21, 1996, and entered a judgment of foreclosure. The judgment determined that MD Associates was indebted to Guardian in the amount of $14,320,911 on the first note and $2,920,878 on the second note, with additional specified interest accruing per day from September 16, 1996. It ordered the sale of the 1235 Mission Street property and the Series B certificates and adjudicated MD Associates and Michael D. Barker personally liable for payment of the sums secured by the deeds of trust on the property and the pledge of the certificates. The court retained jurisdiction to determine the amount of the deficiency judgment, if any, to be entered after payment to Guardian of the proceeds of sale.

DISCUSSION

A. Choice-of-law Provision

As the principal assignment of error in this appeal, appellants contend that the trial court erred in enforcing a choice-of-law provision adopting Texas law, included in both the first and second notes secured by the 1235 Mission Street property. It is undisputed that Guardian Savings is a Texas savings and loan association. MD Associates is a joint venture between Barker and Dean Patrinely that, at the inception of this secured transaction,[1] had contacts with Texas *155 essentially equivalent to those of a Texas domiciliary. Both notes are captioned "Houston, Texas" and give a Houston address for the joint venture; they specifically rely on Texas regulatory law and were payable at Guardian's Texas office. The joint venture agreement of MD Associates identifies Barker and Patrinely as residents of Harris County, Texas; contains a choice-of-law provision adopting Texas law; states that the joint venture is formed under the laws of the State of Texas; describes the joint venture as having a place of business at the same Houston address found in the notes; and requires notices to be given at that Houston address. In a response to answers to interrogatories, the defendants themselves describe MD Associates as a "Texas joint venture."
Appellants claim that MD Associates gave the secured notes for the purpose of acquiring the rights to 1235 Mission Street that Guardian possessed under agreements with Delta for purchase of 100 First Street and thus the notes related in substance to purchase-money security interests. While California Code of Civil Procedure section 580b bars a deficiency judgment following foreclosure of a purchase-money security interest, Texas law imposes no similar restriction. Appellants concede that, if the choice-of-law provision was enforceable, the trial court properly entered a deficiency judgment on the unpaid balance of the notes.
In determining the enforceability of the choice-of-law provision, we are guided by the analysis in Nedlloyd Lines B.V. v. Superior Court (1992) 3 Cal.4th 459, 11 Cal.Rptr.2d 330, 834 P.2d 1148, which held a choice-of-law provision choosing Hong Kong law to be fully enforceable and applicable to the plaintiffs claims. The court rested its decision "on the choice-of-law rules derived from California decisions and the Restatement Second of Conflict of Laws[[2]], which reflect strong policy considerations favoring the enforcement of freely negotiated choice-of-law clauses." (Id. at p. 462, 11 Cal.Rptr.2d 330, 834 P.2d 1148.)[3]
The Nedlloyd court adopted the "modern approach" of section 187 of the Restatement as a statement of applicable principles, stating unequivocally: "In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement section 187...." (Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th at pp. 464-465, 11 Cal.Rptr.2d 330, 834 P.2d 1148, fn. omitted.) Since the present case does not concern an issue "which the parties could have resolved by an explicit provision in their agreement" (Rest, § 187, subd. (1)) but rather the "substantial validity" of a deficiency judgment based on the provisions of secured promissory notes (Rest, § 187, com. d), it is governed by subdivision (2) of section 187.
Restatement section 187, subdivision (2) provides: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of *156 § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."
As summarized in the Nedlloyd decision, the analytical approach adopted by section 187 requires "the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. If there is no such conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a `materially greater interest than the chosen state in the determination of the particular issue....' [Citation.]" (Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th at p. 466, 11 Cal.Rptr.2d 330, 834 P.2d 1148, fns. omitted.)
Applying this test, it is clear that the chosen state, Texas, has a substantial relationship to the parties. "`A party's incorporation in a state is a contact sufficient to allow the parties to choose that state's law to govern their contract.'" (Nedlloyd Lines B.V. v. Superior Court, supra, 3 Cal.4th at p. 467, 11 Cal.Rptr.2d 330, 834 P.2d 1148, quoting Carlock v. Pillsbury Co. (D.Minn.1989) 719 F.Supp. 791, 807; see also Hambrecht & Quist Venture Partners v. American Medical Intermit., Inc., supra, 38 Cal.App.4th at p. 1545, 46 Cal.Rptr.2d 33.) Thus, the Nedlloyd court found a substantial relationship when two of at least nine contracting parties were incorporated in the chosen state, and, in Hambrecht & Quist Venture Partners v. American Medical Internal, Inc., supra, at p. 1546, 46 Cal.Rptr.2d 33, the court found a substantial relationship where two of the three parties to the transaction in question were incorporated in the chosen state. Here, Guardian, the payee under the promissory notes, was undisputedly a corporation formed under Texas law and doing business in that state.
We next must consider whether the application of Texas law pursuant to the choice-of-law provision is contrary to "a fundamental policy of California." We are guided by the purposes attributed to the antideficiency legislation, and the case law pertaining to waiver of Code of Civil Procedure section 580b[4] protections. Our analysis leads us to conclude that the bar to deficiency judgments set forth in section 580b reflects a fundamental policy that is in conflict with the choice-of-law provision contained in the agreements.
Section 580b provides in pertinent part: "No deficiency judgment shall he in any event ... under a deed of trust ... given to the vendor to secure payment of the balance of the purchase price of that real property..., or under a deed of trust ... on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of that dwelling occupied, entirely or in part, by the purchaser." It was enacted in 1933 as part of a series of statutes, including the fair-market-value limitations of sections 726 and 580a, that were intended to aid debtors who had lost real property through foreclosure in the depression. (Cornelison v. Kornbluth (1975) 15 Cal.3d 590, 600-601, 125 Cal.Rptr. 557, 542 P.2d 981; Palm v. Schilling (1988) 199 Cal. App.3d 63, 68, 244 Cal.Rptr. 600; Younker v. Reseda Manor (1967) 255 Cal.App.2d 431, 434, 63 Cal.Rptr. 197.) The related provisions of section 580d, which bars a deficiency judgment following private sales, were enacted later in 1940. The statute assumed its present form in 1963 through an amendment, which clearly defined the rights of nonvendor purchase-money lenders. (Stats.1963, ch. 2158, § 1, p. 4500.) The amendment distinguished between nonvendor purchase-money loans with respect to whether or not they were made for homeownership, applying the *157 antideficiency protection only to loans for that purpose.
In Roseleaf Corp. v. Chierighino (1963) 59 Cal.2d 35, 42, 27 Cal.Rptr. 873, 378 P.2d 97 (hereafter Roseleaf), the court ascribed the legislative purpose of section 580b to two policy objectives relating to economic stabilization preventing overvaluation of real property and avoiding the aggravation of an economic downturn in a depression. (See Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) §§ 4.26-4.28, pp. 206-210.) The Roseleaf decision explained, "Section 580b places the risk of inadequate security on the purchase money mortgagee. A vendor is thus discouraged from overvaluing the security. Precarious land promotion schemes are discouraged, for the security value of the land gives purchasers a clue as to its true market value. [Citation.] If inadequacy of the security results, not from overvaluing, but from a decline in property values during a general or local depression, section 580b prevents the aggravation of the downturn that would result if defaulting purchasers were burdened with large personal liability. Section 580b thus serves as a stabilizing factor in land sales." (Roseleaf, supra, at p. 42, 27 Cal.Rptr. 873, 378 P.2d 97.) The second of these objectivesto prevent the aggravation of a depression-induced downturn in property valueswas termed the "primary purpose of section 580b" in Cornelison v. Kornbluth, supra, 15 Cal.3d at p. 603, 125 Cal.Rptr. 557, 542 P.2d 981, which analyzed the statutory purpose solely in terms of that objective.[5]
A third legislative purposethe equitable allocation of riskfinds some limited recognition in dicta and scholarly comment and is reflected in decisions limiting the scope of section 580b. In Cornelison v. Kornbluth, supra, 15 Cal.3d at p. 601, 125 Cal.Rptr. 557, 542 P.2d 981, the court observed that "[i]n certain situations," the Legislature regarded deficiency judgments as being "too oppressive," even when restricted by the fairmarket-value limitations of sections 726 and 580a. Deficiency judgments on purchase-money security interests may sometimes be regarded as oppressive where the seller is restored to ownership of the property through the foreclosure proceedings and also retains principal payments received from the purchaser. (See Shadduck, Application of California's Antideficiency Statutes in Conflict of Laws Contexts (1985) 73 Cal.L.Rev. 1332, 1372.) Moreover, it has been suggested that the seller may fairly be required to assume the risk of inadequate security because the seller is better able to know the value of the land than the buyer. Although the court in Roseleaf discounted the importance of this consideration, as it was articulated in an earlier Supreme Court decision, Brown v. Jensen (1953) 41 Cal.2d 193, 197, 259 P.2d 425, it was mentioned more recently in Thompson v. Allert (1991) 233 Cal.App.3d 1462, 1467, 285 Cal.Rptr. 367 ("Knowing the value of their security, appellants assumed the risk that it could, as it did, prove to be inadequate"), and may probably be accepted at least as an ingredient of the sense of equity that motivated passage of the legislation. (Roseleaf supra, 59 Cal.2d at p. 42, 27 Cal.Rptr. 873, 378 P.2d 97.)
The Supreme Court has recognized considerations of equitable allocation of risk restricting application of section 580b to subordinated purchase-money securities. In Spangler v. Memel (1972) 7 Cal.3d 603, 102 Cal.Rptr. 807, 498 P.2d 1055 (hereafter Spangler), the plaintiffs sold their home to commercial real estate developers and agreed to subordinate their purchase-money security interest to the purchasers' construction loan. The purchasers defaulted on the construction loan and the lender foreclosed, depriving the plaintiffs of their subordinated security interest. Affirming a judgment in favor of the plaintiffs for the balance of the purchase price, the court noted the inequity of applying section 580b in this situation: "If ... section 580b is applied to prevent the vendor from suing on his promissory note, after the development has failed and the senior lienor has caused the property to be sold, the risk of the failure of the commercial development is thrust upon the vendor. In fact, however, the success of the commercial development *158 depends upon the competence, diligence and good faith of the developing purchaser. It would seem proper, therefore, that the purchaser not the vendor bear the risk of failure, particularly since in the event of default, the junior lienor vendor will lose both the land and the purchase price." (7 Cal.3d at p. 613, 102 Cal.Rptr. 807, 498 P.2d 1055.)
Though the Spangler court relied in part on the legislative purposes ascribed to section 580b in the Roseleaf decision, the court in Budget Realty, Inc. v. Hunter, supra, 157 Cal.App.3d at p. 516, 204 Cal.Rptr. 48, viewed the "more convincing rationale of Spangler" to be the "equitable analysis" of risk allocation. The same focus on the element of risk is found in other decisions dealing with subordinated purchase-money security interests. (See Wright v. Johnston (1988) 206 Cal.App.3d 333, 337-338, 253 Cal. Rptr. 418 [agreement "exposes the seller to new risks"]; Roskamp Manley Associates, Inc. v. Davin Development & Investment Corp. (1986) 184 Cal.App.3d 513, 517, 229 Cal.Rptr. 186 ["unique risks" involved in subordination].) Similarly, in reviewing recovery for waste, the court in Cornelison v. Kornbluth supra, 15 Cal.3d at p. 604, 125 Cal.Rptr. 557, 542 P.2d 981, invoked the consideration of equitable risk allocation to limit the scope of section 580b.[6]
Finally, as it applies to homeowners, section 580b reflects a policy encouraging homeownership by limiting risks of financial loss in acquiring a home. In Nevin v. Salk (1975) 45 Cal.App.3d 331, 341, 119 Cal.Rptr. 370, the court ventured the opinion that "the main goal of the Legislature in enacting and amending section 580b was to protect the ordinary buyer from personal liability when purchasing a home." While this statement may be overly broad, the importance of homeowner protection is unmistakably revealed in the 1963 amendment to section 580b. As section 580b applies to the sale of a home, the amendment extended the antideficiency protections to both vendor financing and third-party financing for the purchase price; with respect to other sales, the antideficiency protection applies only to vendor financing.
Without attempting to assess the relative importance of the objectives attributed to section 580b, we are persuaded that the statute reflects a "fundamental policy" of the state within the meaning of section 187 of the Restatement. Comment g to section 187 acknowledges that "[n]o detailed statement can be made of the situations where a `fundamental' policy of the state ... will be found to exist" and affirms only that "[t]o be `fundamental,' a policy must in any event be a substantial one" and "need not be as strong as would be required to justify the forum in refusing to entertain suit upon a foreign cause of action...."[7]
We note that decisions in other jurisdictions have found a fundamental policy within the meaning of Restatement section 187 underlying legislation comprising a scheme of economic regulation[8] or intended to redress "oppressive use of superior bargaining power."[9] The policies underlying such legislation bear some analogy to the economic objectives mentioned in the Roseleaf decision and the equitable allocation of risk discussed above.
*159 Our conclusion that the antideficiency legislation reflects a fundamental policy is supported by California precedents dealing with the waiver or evasion of section 580b. It is well established that "[t]he antideficiency provisions of Code of Civil Procedure section 580b may not be contractually waived as a condition of the encumbrance of real property with a purchase money mortgage or deed of trust ... so long as it continues to be secured with the original real estate." (Palm v. Schilling, supra, 199 Cal.App.3d at p. 65, 244 Cal.Rptr. 600.) Such an agreement, "if made, [is] contrary to public policy, void and ineffectual for any purpose." (Vialinda Builders, Inc. v. Bissner (1964) 230 Cal.App.2d 106, 112, 40 Cal.Rptr. 735.) Similarly, the courts have invalidated attempts to circumvent section 580b by looking to the substance rather than the form of a transaction. The statute has been applied even though a transaction was structured through separate escrows (BMP Property Development v. Melvin (1988) 198 Cal.App.3d 526, 531, 243 Cal.Rptr. 715) or by use of a straw man (Ziegler v. Barnes (1988) 200 Cal.App.3d 224, 228-230, 246 Cal.Rptr. 69). In the Ziegler decision, the court observed, "If a vendee cannot by contract waive purchase money protection [citation], we refuse to find that protection dissipated by agreeing to an exchange, for the vendor's advantage, which purports to pass the purchase money through a third party." (Id. at p. 230, 246 Cal.Rptr. 69.) Decisions construing the partially analogous provisions of section 580d[10] have also invalidated contractual waivers (Freedland v. Greco (1955) 45 Cal.2d 462, 467-468, 289 P.2d 463) and attempts to evade the statute by guarantees and indemnity contracts. (River Bank America v. Diller (1995) 38 Cal.App.4th 1400, 1420-1424, 45 Cal. Rptr.2d 790; Torrey Pines Bank v. Hoffman, supra, 231 Cal.App.3d at pp. 317-323, 282 Cal.Rptr. 354; Commonwealth Mortgage Assurance Co. v. Superior Court (1989) 211 Cal.App.3d 508, 514-517, 259 Cal. Rptr. 425; Union Bank v. Brummell (1969) 269 Cal.App.2d 836, 838, 75 Cal.Rptr. 234.) Recently in DeBerard Properties, Ltd. v. Lim (1998) 62 Cal.App.4th 1251, 1255-1260, 73 Cal.Rptr.2d 302 [Review granted July 8, 1998 (S070347)], a waiver of the protections of section 580b that was included in a forbearance agreement was found to be invalid.
These precedents, in our opinion, reveal a policy sufficiently strong to be characterized as fundamental within the meaning of Restatement section 187 because they elevate the statutory policy of section 580b above the consensual arrangements of the parties.[11] If the policy underlying section 580b bars avoidance of the statute by contractual waiver or a formal structuring of a transaction, it should be fundamental enough to restrict use of a choice-of-law provision to avoid application of the statute. In many circumstances, the enforcement in California courts of a choice-of-law provision adopting out-of-state law will be the practical equivalent of enforcing a contractual waiver of section 580b. Since the threshold requirement of Restatement section 187 is met whenever the lender is a domiciliary in the chosen state,[12] creditors *160 could often use a choice-of-law provision to accomplish a result that would be "contrary to public policy, void and ineffectual" if attempted directly by a contractual waiver.
Having concluded that section 580b reflects a fundamental policy in California, we turn to the last criterion of the Restatement testwhether California has "a materially greater interest than the chosen state in the determination of the particular issue." (Rest., § 187, subd. (2).) We construe the, reference to "the particular issue" as calling for an inquiry into the specific facts of an individual case. (Ibid.)
The policies underlying section 580b in fact have limited application to the present case. First, the transaction does not involve the sale of a home, which would implicate the strong policies reflected in the 1963 amendment of the statute. Second, the policy of equitable risk allocation does not apply to a transaction negotiated between sophisticated Texas domiciliaries. While California may have an interest in the performance of a transaction within the state, it has a more questionable interest in the equitable nature of the transaction where the rights and duties of the parties were established by agreement of non-domiciliaries outside its jurisdiction. Such an interest is clearly absent where, as here, the bargain was negotiated between sophisticated, professional `investors in a specialized field. Finally, the second objective recognized in the Roseleaf decision, which the Spongier court regarded as the "primary" objectiveto prevent the aggravation of a downturn in market pricesbecomes more problematic when both parties are domiciliaries of another state. Whether or not the transaction implicates this policy will be dependent on many circumstances that cannot be as readily presumed as in the case of a transaction with more contacts within the state.
At the same time, the interest of Texas in assuring the justified expectations of the parties to an agreement has maximum force where the agreement is negotiated between domiciliaries of that state. In DeSantis v. Wackenhut Corp. (Tex.1990) 793 S.W.2d at p. 677, the Texas Supreme Court observed that "the most basic policy of contract law ... is the protection of the justified expectations of the parties. [Citations.] The parties' understanding of their respective contractual rights and obligations depends in part upon the certainty with which they may predict how the law will interpret and enforce their agreement. [Citation.] [¶] When parties to a contract ... expect to perform their respective obligations in multiple jurisdictions, they may be uncertain as to what jurisdiction's law will govern construction and enforcement of the contract. To avoid this uncertainty, they may express in their agreement their own choice that the law of a specified jurisdiction apply to their agreement. Judicial respect for their choice advances the policy of protecting their expectations."
Under the specific circumstances of the present case, we hold that California's interest in the enforcement of the policies underlying section 580 is not materially greater than Texas's policy of assuring the justified expectations of the parties. We recognize that the issue is close and limit our holding to the peculiar facts of this case: a series of complex security interests on a large commercial property, negotiated between sophisticated Texas domiciliaries. Under these narrow circumstances, we consider that Restatement section 187 calls for enforcement of the provision in the promissory note adopting Texas law. In the absence of the bar of section 580b, the trial court properly entered a judgment for the unpaid balance on the notes.[13]

B. Distribution of Foreclosure Sales Proceeds

Appellant next contends that paragraph 4 of the judgment of foreclosure and order of sale erred in directing the distribution of proceeds from the foreclosure sale of the 1235 Mission property and Series B bonds. The paragraph provides that the sales proceeds be applied in satisfaction of the two liens according to their order of *161 priority. Specifically, it provides that payment is "to be credited first against the amount owing on the first Note and second against the amount owing on the second Note." The "Note" is defined as the note dated May 30, 1985, in the original principal amount of $10.4 million; the "second Note" as the note dated as of January 1, 1990, incorporating accrued interest in the original principal amount of $1,411,138. Since the deeds of trust securing each note were apparently recorded shortly after their execution, the deed of trust securing the $10.4 million note has priority over that of the second $1.4 million note.[14]
Appellant contends that although the judgment reflects the usual order of priority, it is contrary to the agreement of the parties. The "Modification Agreement," dated January 1, 1990, provides that "Net Cash Flow" remitted to Guardian as "Payee" under the two notes shall be applied first to payment of interest on each note, giving priority to the $10.4 million note, and then to payment of principal on each note, again giving priority to the $10.4 million note.[15] The modification agreement defines the term "Net Cash Flow" to include "proceeds ... from any sale, ... foreclosure or other similar disposition of any portion of the Mortgage Property." The second $1.4 million note contains an identical definition of the term.
Appellants have an interest in securing payment according to the order of priority in the "Modification Agreement" because the first $10.4 million note was modified in 1990 to be nonrecourse under some circumstances. The second $1.4 million note, however, is recourse according to its terms. Hence, it is to appellants' advantage to secure payment of at least the accrued interest on the recourse note for $1.4 million note before payment of the principal on the nonrecourse note for $10.4 million.
We see no significant ambiguity in the loan documents. The definition of "Net Cash Flow" clearly includes foreclosure sales proceeds, even though it is prefaced by an inconsistent phrase, "Throughout the term of this note." Since the debtor and secured party have the power to alter the priority of hens by agreement, the terms of the "Modification Agreement" should govern the distribution of sales proceeds.

C. Judgment against Barker-Pacific Group, Inc.

Lastly, appellants complain that the court improperly entered judgment against Barker-Pacific Group, Inc. Paragraph 8 of the judgment orders that identified defendants, including Barker-Pacific Group, Inc., "are forever barred and foreclosed from all equity or redemption in and claim to the premises...." The complaint in fact names Barker-Pacific Group, Inc. (then known as Barker-Patrinely Group, Inc.) only in the third cause of action, which Guardian dismissed without prejudice before judgment was entered. Since Barker-Pacific Group, Inc. was no longer a defendant, the trial court erred in entering judgment against it.

DISPOSITION
The judgment is reversed as to Barker-Pacific Group, Inc. The case is remanded for modification of paragraphs 4 and 8 of the judgment pursuant to this decision. In all other respects, the judgment is affirmed. Each party is to bear its own costs.
STRANKMAN, P.J., and DOSSEE, J., concur.
NOTES
[1] Though Barker declares that he moved his family to California "in 1986" and that MD Associates was headquartered in San Francisco in 1990, we find no triable issue of fact with regard to the status of the joint venture as a Texas domiciliary at the time the financing was negotiated in early 1986. In the interest of assuring the justified expectations of the parties (Rest.2d Conf. of Laws, § 6, subd. (2)(d)), the 1990 restructuring should be governed by the same choice-of-law rule as the original financing.
[2] Hereafter referred to simply as Restatement.
[3] In addition to the California precedents cited in the Nedlloyd opinion on page 464, 11 Cal.Rptr.2d 330, 834 P.2d 1148, we note that decisions concerning secured promissory notes have evidenced a policy favoring the enforceability of choice-of-law provisions. (Consolidated Capital Income Trust v. Khaloghli (1986) 183 Cal.App.3d 107, 227 Cal.Rptr. 879 [promissory note provision requiring application of California law]; Hersch and Co. v. C and W Manhattan Associates (9th Cir.1982) 700 F.2d 476 [promissory note provision requiring application of California law]; Kerivan v. Title Ins. & Trust Co. (1983) 147 Cal.App.3d 225, 195 Cal.Rptr. 53 [promissory note provision requiring application of Colorado law]; see also Hambrecht & Quist Venture Partners v. American Medical Intemat., Inc. (1995) 38 Cal.App.4th 1532, 1544, 46 Cal.Rptr.2d 33.)
[4] All further references to code sections are to the Code of Civil Procedure unless otherwise indicated.
[5] For a criticism of the rationale relating to the prevention of real property overvaluation, see Budget Realty, Inc. v. Hunter (1984) 157 Cal. App.3d 511, 515-516, 204 Cal.Rptr. 48.
[6] While recognizing the close interrelationship between damages for waste and a deficiency judgment, the court sanctioned a cause of action for "bad faith" waste, involving intentional or reckless conduct, since losses from this sort of conduct "do not involve the type of risk intended to be borne by [the seller] in promoting the objectives of section 580b alluded to above." (Cornelison v. Kornbluth, supra, 15 Cal.3d at p. 604, 125 Cal.Rptr. 557, 542 P.2d 981.)
[7] Similarly, we consider that United Bank of Denver v. K & W Trucking Co. (1983) 147 Cal.App.3d 217, 195 Cal.Rptr. 49, which concerns enforcement of a foreign judgment, has no relevance to the issue of choice of law.
[8] E.g., DeSantis v. Wackenhut Corp. (Tex. 1990) 793 S.W.2d 670, 680; National Glass v. J.C. Penney (1994) 336 Md. 606, 650 A.2d 246, 250; Young v. Mobil Oil Corp. (1987) 85 Or.App. 64, 735 P.2d 654, 659.
[9] E.g., Electrical and Magneto Service v. AMBAC Intern. (8th Cir.1991) 941 F.2d 660, 662-663; Solman Distributors, Inc. v. Brown-Forman Corp. (1st Cir.1989) 888 F.2d 170, 172. The quoted phrase is taken from comment g, section 187 of the Restatement, page 568.
[10] Section 580d may provide guidance for applying section 580b because both statutes form part of a legislative scheme involving similar or overlapping policies (see Torrey Pines Bank v. Hoffman (1991) 231 Cal.App.3d 308, 318, 282 Cal. Rptr. 354), but section 580d reflects distinct legislative purposes. As explained in Comelison v. Kornbluth, supra, 15 Cal.3d at p. 602, 125 Cal. Rptr. 557, 542 P.2d 981, the enactment of section 580d in 1940 was intended to place judicial foreclosure sale and private nonjudicial foreclosure sale on a parity. "`If the creditor wishes a deficiency judgment, his sale is subject to statutory redemption rights. If he wishes a sale resulting in nonredeemable title, he must forego the right to a deficiency judgment. In either case the debtor is protected.'" While the right of redemption in judicial sales serves to deter underbidding at the foreclosure sale, section 580d prevents the secured creditor from profiting from underbidding. (Cal. Mortgage and Deed of Trust Practice (Cont.Ed.Bar 2d ed. 1990) § 4.16, pp. 198-199.)
[11] Our conclusion is consistent with decisions holding that a suit in California on a purchasemoney note secured by a deed of trust on property in another state is barred by section 580b (Stuart v. Lilves (1989) 210 Cal.App.3d 1215, 1219, 258 Cal.Rptr. 780; Younker v. Reseda Manor, supra, 255 Cal.App.2d 431, 63 Cal.Rptr. 197; Kish v. Bay Counties Title Guaranty Co. (1967) 254 Cal.App.2d 725, 733, 62 Cal.Rptr. 494), though the issues are substantially different in the absence of a contractual choice-of-law provision.
[12] Only five other states have purchase-money antideficiency statutes. (Comment, Application of California's Antideficiency Statutes in Conflict of Laws Contexts, supra, 73 Cal.L.Rev. at p. 1365, fn. 167.)
[13] In view of our conclusion that the choice-of-law provision is enforceable, we do not reach the issue of whether or not the financing transactions were of the type that come within the provisions or purposes of section 580b, and we express no opinion on that issue.
[14] The date of recording of the deed of trust securing the "first Note" is illegible in the appellate record.
[15] "In the event the payment remitted to Payee is the Net Cash Flow, Net Cash Flow shall be applied by Payee [Guardian] to the Obligations (as defined in the Loan Agreement) owed by Maker [MD Associates] to Payee under the Loan Agreement in the following order of priority: (a) First, to pay the Basic Interest due under this note [the "first Note" in the original principal sum of $10.4 million]; (b) Second, to pay the Basic Interest due under the Second Note (as defined in the Loan Agreement) [the "second Note," in the original principal amount of $1,411,138]; (c) Third, to pay the Net Cash Flow Interest due under this note; (d) Fourth, to pay the Net Cash Flow Interest due under the Second Note; (e) Fifth, to pay principal on this note; (f) Sixth, to pay principal on the Second Note."